**COMMONWEALTH OF PENNSYL-
VANIA et al.**

v.

**James T. LYNN, Secretary of Housing
and Urban Development, et al.,
Appellants.**

**No. 73-1835.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 12, 1973.

Decided July 19, 1974.

Rehearing Denied Sept. 25, 1974.

U. S. Atty. at the time the brief was filed, and William D. Appler, Atty. Dept. of Justice, were on the brief, for appellants.

William A. Dobrovir, Washington, D. C., with whom Stephen C. Miller, Asst. Atty. Gen., Commonwealth of Pennsylvania, and Andra N. Oakes, Washington, D. C., were on the brief, for appellees.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

McGOWAN, Circuit Judge:

This is an appeal from a grant of summary judgment requiring the Secretary of Housing and Urban Development (HUD) to resume accepting, processing, and, where appropriate, approving applications for federal subsidy under three different housing programs. 362 F. Supp. 1363 (D.D.C., 1973). The District Court's order to this effect has never been operative by reason of ·a Supreme Court stay order. See 414 U.S. 809, 94 S.Ct. 26, 38 L.Ed.2d 44 (1973). For the reasons stated hereinafter, we reverse the judgment of the District Court.

I

The three programs involved in this suit[1] are as follows:

1. Section 101 is a rent supplement program under which the federal government agrees to make monthly rental payments on behalf of qualified tenants in housing erected under other government programs, such as 236 and 221(d)(3) projects. See 12 U.S.C. §§ 1701s(b), 1715$l$(d)(3). The government's contract with the developer, which may run for up to forty years, provides for HUD supervision of rent charges and tenant eligibility. Tenants, who must have incomes and assets below the applicable area maxima for public housing eligibility and

Robert E. Kopp, Atty., Dept. of Justice, with whom Irving Jaffe, Acting Asst. Atty. Gen., Harold H. Titus, Jr.,

---

1. Section 101 of the HUD Act of 1965, 12 U.S.C. § 1701s, and Sections 235 and 236 of the HUD Act of 1968, 12 U.S.C. §§ 1715z, 1715z–1, of the National Housing Act, 12 U.S.C. § 1701 et seq. (as added by Sections 101 and 201 of the HUD Act of 1968, 12 U. S.C. §§ 1715z and 1715z–1).

be drawn from one of six specially targeted groups, pay rent equal to 25% of their income, and HUD pays the rest.

2. Section 235 is aimed at "assisting lower income families in acquiring homeownership" by subsidizing construction of single-family units for their purchase. The builder/sponsor enters into an agreement whereby the government insures the mortgage, and then subsidizes its repayment to the extent that principal, interest, taxes, and insurance exceed 20% of the qualified vendee's income, with a subsidy ceiling so that the effective interest rate is not reduced below one per cent.

3. Section 236 follows a similar pattern for the purpose of "reducing rentals for lower income families" in housing owned by non-profit or "limited dividend" sponsors. HUD and the sponsors enter into an agreement for government regulation of rents and tenant eligibility, in return for which the government insures the mortgage and undertakes to pay the mortgage interest in excess of one per cent. Tenants pay rent calculated on the basis of operating expenses and mortgage interest at one per cent, or twenty-five per cent of their income, whichever is greater.

Housing is constructed under Sections 235 and 236 at the initiative of a sponsor who makes a specific proposal to HUD, generally first at an informal, prefeasibility conference with local HUD representatives. If the HUD representative indicates that approval of a Section 236 project would be likely under applicable guidelines,[2] the sponsor will submit a formal application for a feasibility letter. If approved, HUD issues a feasibility letter and reservation of contract authority conditioned on completion of final building plants within a specified time.[3] When the plans are submitted, it issues either a conditional or firm commitment, depending upon whether further changes are deemed necessary. With a firm commitment in hand, the sponsor arranges for the closing of a construction loan at which HUD will endorse the mortgage note. Construction then begins, often more than two years after the initial application was submitted.

For Section 235 proposals, if approved, HUD makes a reservation of contract authority, conditioned on completion of construction and a proposed sale to an eligible purchaser within a set time. The sponsoring builder then builds the houses and locates a buyer who enters into an assistance payment contract with HUD which is incorporated into the mortgage insurance contract between HUD and the mortgagee.[4]

Unlike Sections 235 and 236, the Section 101 rent supplement program is not an independent housing construction program but an incentive that is piggybacked onto projects under other programs. Thus, HUD may enter into an agreement prior to construction of Section 236 housing to reserve funds for making rent supplement payments to the developer, who in turn dedicates a specific number of units to the Section 101 program.

Early in 1973, the Secretary, after consultation with the President, ordered the suspension of these and the other principal federal housing subsidy programs,[5] and at the same time announced that HUD would conduct a

---

2. *See* 24 C.F.R. Subpart N, Project Selection Criteria, §§ 200.700 et seq. (1974).

3. The period from initial contact to the issuance of a feasibility letter is typically nine to eighteen months long.

4. Firm commitments are made under this program on a unit-by-unit basis only after construction and proposed sale to an eligible buyer. Construction is induced, however, by the sponsor's reasonable reliance on firm reservation of contract authority.

5. Also suspended were the Section 23 public housing leasing program, 42 U.S.C. § 1421b, the Section 106 program of assistance to

thorough study and evaluation of the suspended programs in order to determine whether they should be continued, terminated, or modified.[6] On March 8, 1973, in his State of the Union Message on Community Development,[7] the President informed Congress that the study would be completed by the following September.[8] Thereafter, on May 21, with the programs still suspended, appellees[9] filed this suit challenging the Secretary's authority to suspend the programs.[10]

■■ The District Court allowed the action to proceed as a class suit, and rejected appellant's arguments that doctrines of standing, sovereign immunity, and political question barred relief.[11] It held that the relevant statutes do not invest the Secretary with any discretion to suspend processing and approval of qualified applications for housing subsidy, and that the executive power vested in the President by Article II of the Constitution does not authorize refusal to execute these laws. Because we hold a different view with respect to the first of these issues, we do not reach the second.

II

The narrow question we decide is whether the Secretary has, under the housing subsidy statutes and relevant declarations of congressional policy, dis-

non-profit sponsors of low and moderate income housing, 12 U.S.C. § 1701x, and a number of community development programs and subsidy programs directed to the problems of rural housing. E. g., Section 521 interest credit program, which was ordered resumed in Pealo v. Farmers Home Administration, 361 F.Supp. 1320 (D.D.C.1973). The Section 23 leasing program was later resumed. 119 Cong.Rec. H8073 (daily ed. Sept. 19, 1973).

6. The suspension did not purport to dishonor commitments already made. Thus, on January 8, 1973, the Secretary of HUD directed all HUD field offices, until further notice, to:

(1) issue no further conditional commitments under Section 235 except pursuant to firm reservations of contract authority issued to developers on or before close of business January 5, 1973 and (2) issue no feasibility letters or make fund reservations under Section 236 or under the Section 101 rent supplement program after the close of business January 5, 1973.

7. H.R.Doc.No.57, 93d Cong., 1st Sess. (1973).

8. The President reported on the conclusions of the study on September 19. 119 Cong. Rec. H8070 (daily ed. Sept. 19, 1973). The study itself was transmitted to Congress by the Secretary on October 6.

9. In addition to the Commonwealth of Pennsylvania, appellees include the Maine State Housing Authority, several non-profit organizations in various stages of preparedness to sponsor projects under the affected programs, and an organization for the elimination of discrimination in housing.

10. Appellees have maintained throughout that the January 8 action constituted a termination rather than suspension of the programs. See Complaint ¶ 1(b). Since, in our view, the authority to suspend the programs for the purpose of deciding whether to terminate them necessarily entails the latter power, we attach no significance to the semantic dispute. In the Secretary's view, he terminated these programs only after completion of the study evaluating their viability, the same time at which he resumed operating the Section 23 program. Indeed, the September termination was itself qualified, since the President lifted the suspension as to "subsidy applications for units which had moved most of the way through the application process by January 5 [1973]." 119 Cong.Rec. H8073 (daily ed. Sept. 19, 1973). The applications here referred to were clearly distinct from those left unaffected by the suspension order, see note 6 supra, for the President's next sentence was that, "[i]n addition, the Department will process applications in cases where bona fide commitments have been made." (Emphasis added.)

11. Appellant renews in this court his argument that the case presents a non-justiciable political question, and seeks to "preserve" the objection of sovereign immunity, which he recognizes to be contrary to the prior decisions of this court. We reject both arguments on the basis of the opinion below. As to sovereign immunity, we note in addition that 12 U.S.C. § 1702 provides in part that "[t]he Secretary shall, in carrying out the provisions of [subchapter II of chapter 13, title 12] be authorized in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal." Both the 235 and 236 programs are established under subchapter II of chapter 13, title 12.

cretion to withhold exercise of contract authority, given him by Congress for a specific purpose, in order to determine whether that purpose would be achieved or frustrated by its continued exercise under existing circumstances. The issue is no broader because it is undisputed that, when the Secretary suspended the programs, he did so for "program-related" reasons, and not for reasons of policy—such as fiscal policy—extrinsic to the operation of the programs.[12] As stated in the Brookings Institution's annual budget analysis:[13]

> Since expenditures under these programs only occur after occupancy of completed housing units, the Secretary's announcement had essentially no budgetary impact during fiscal 1973 and will reduce expenditures in fiscal 1974 only slightly. Hence, it is clear that the administration's decision to halt new commitments under assisted housing programs is not primarily a response to current budgetary stringency. Rather it reflects real concern about the equity and efficiency of these programs.

While it may be doubted whether mere "concern about the equity and efficiency" of a program duly established by Congress could, without more, support an executive decision to suspend its operation, it is clear that this is not the usual case of claimed authority "to defer approval for reasons totally collateral and remote" to the purpose of the authorizing legislation. State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1114 (8th Cir. 1973). See Campaign Clean Water, Inc. v. Train, 489 F.2d 492, 494 (4th Cir. 1973); Guadamuz v. Ash, 368 F.Supp. 1233, 1241 (D.D.C.1973); Commonwealth of Pennsylvania v. Weinberger, 367 F.Supp. 1378, 1381 (D.D.C.1973); National Council of Community Mental Health Centers, Inc. v. Weinberger, 361 F.Supp. 897, 901–902 (D.D.C.1973); State of Oklahoma v. Weinberger, 360 F.Supp. 724, 728 (W.D.Okl.1973); Local 2677, AFGE v. Phillips, 358 F.Supp. 60, 78 (D.D.C.1973); cf. Commonwealth of Massachusetts v. Weinberger, Civ.Action No. 1308–73, slip op. at 7 (D.D.C. July 26, 1973). Accordingly, our inquiry is limited to two subjects: (1) whether the Congress gave the Secretary discretion to halt the programs for program-related reasons, and (2) if so, whether that discretion was abused.

### III

Whether Congress gave the Secretary the discretion here claimed is preeminently a question of intent. Minor v. Mechanics' Bank, 26 U.S. (1 Pet.) 46, 64, 7 L.Ed. 47 (1828); see Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962). We begin this aspect of our inquiry, therefore, with the text of the organic statutes. Since all follow the same pattern, only one need be described in any detail.

The operative authorization and authorization of appropriations subsections of 12 U.S.C. § 1715z (Section 235) provide:

> (a) For the purpose of assisting lower income families in acquiring homeownership or in acquiring membership in a cooperative association operating a housing project, the Secretary is authorized to make, and to contract to make, periodic assistance payments on behalf of such homeowners and cooperative members. . . .

---

12. Brief of Appellees at 17, 35. In a speech on January 8, the day of the suspension, Secretary Romney said that by 1970 "[i]t was clear that literally billions and billions of dollars of hard-earned taxpayer money were being wasted, particularly in our central cities, and that hundreds of thousands of our most needy and disadvantaged citizens, for whom the taxpayers were generously making important financial sacrifices, not only would not benefit, but would be victimized and disillusioned." Remarks before the 29th Annual Convention of the National Ass'n of Home Builders, at Houston, Texas, HUD News Release (Jan. 8, 1973) at 7–8, J.A. 26, 33–34.

13. Setting National Priorities: The 1972 Budget 136.

(h) (i) There are authorized to be appropriated such sums as may be necessary to carry out the provisions of this section, including such sums as may be necessary to make the assistance payments under contracts entered into under this section. . . .

(i) (i) The Secretary is authorized, upon application by the mortgagee, to insure a mortgage executed by a mortgagor who meets the eligibility requirements for assistance payments prescribed by the Secretary under subsection (b) of this section. Commitments for the insurance of such mortgages may be issued by the Secretary prior to the date of their execution or disbursement thereon, upon such terms and conditions as the Secretary may prescribe.

(k) The Secretary shall from time to time allocate and transfer to the Secretary of Agriculture, for use (in accordance with the terms and conditions of this section) in rural areas and small towns, a reasonable portion of the total authority to contract to make assistance payments as approved in appropriation Acts under subsection (h)(i) of this section.

Other subsections govern such matters as eligibility requirements for assistance, limitations on the amount of assistance, and authority to insure mortgages executed by non-profit organizations and public agencies. Subsections (f) and (g) provide that the Secretary shall adopt procedures and prescribe regulations, respectively, for periodic recertification of recipients' income, a factor in the assistance formula, and to assure that sales prices do not exceed appraised value.

The provisions of 12 U.S.C. § 1715z–1 (Section 236) and 12 U.S.C. § 1701s (Section 101) deviate from those above only insofar as the differences in the form of assistance provided and the definition of eligible recipients require. Thus, each authorizes the Secretary to enter into payment contracts, provides that the Secretary shall issue pertinent regulations, and authorizes the appropriation of sums necessary to conduct the program and meet contractual obligations. Like Section 235, dollar limitations on the Secretary's contract authority are specified for the 236 and 101 programs.[14]

The Secretary makes three arguments that he has the discretion here claimed. First, he points to the nonmandatory language of the statutes, particularly in the subsections granting him contract authority. Second, he notes that the statutes' stated purpose is to aid particular groups, from which he infers both the obligation to administer the programs for their benefit, and a correlative discretion to suspend their operation on determining, as here, that there is a substantial likelihood that the programs are principally benefitting others and perhaps actually harming the intended group of beneficiaries.[15] In support of this inference it is urged that it would be unreasonable to impute to Congress an intent that new and experimental programs involving large, long-term financial commitments be blindly pursued no matter how circumstances may have changed. Third, the Secretary suggests that the national housing policy, 42 U.S.C. § 1441, which applies to all federal agencies with housing functions, is better served by the action he has

14. Each section provides that "[t]he aggregate amount of the contracts to make such payments shall not exceed amounts approved in appropriation Acts, and payments pursuant to such contracts shall not exceed" specified annual authorizations. 12 U.S.C. §§ 1701s(a), 1715z(h)(1), 1715z–1(i)(1). Cumulative authorizations and appropriations through Fiscal 1973 are (in millions of dollars):

|             | authorized | appropriated |
|-------------|------------|--------------|
| Section 101 | 433        | 330          |
| Section 235 | 890        | 665          |
| Section 236 | 925        | 700          |

15. We do not understand the Secretary to claim discretion to suspend or terminate the programs merely because they have not worked, but only because, in his judgment, they cannot work no matter how administered.

taken, or at least that he is entitled so to conclude.

### A. *Permissive versus mandatory terms.*

The Secretary's argument from the non-mandatory language of the statutes is not conclusive standing alone. The statutes are indeed replete with evidence of Congress's intention to give the Secretary broad discretion in the programs' administration. Thus, he may prescribe regulations governing eligibility,[16] and building standards,[17] and, under Section 101, any subject he deems in need of regulation to carry out the program.[18] The general pattern of all three statutes is to grant the Secretary discretion over many areas in appropriately permissive language, and to revert to mandatory terms only where Congress is setting minimum conditions on the exercise of his discretion.[19] But discerning Congress's intent to bestow or withhold discretion to suspend the programs in their entirety is not a simple matter of tallying the "shalls" and "mays" and finding that the "mays" have it.[20] Logic, and precedent, *e. g.*, Minor v. Mechanics' Bank, *supra,* require more, and earlier Secretaries have been so advised. *See*

22 Op.Atty.Gen. 295, 296 (1899); *compare id. with* 21 Op.Atty.Gen. 391, 392 and 21 Op.Atty.Gen. 414 (1896).

Here the permissive language of the authorizing sections is more naturally in keeping than would be mandatory language with the tenor of a program to be administered by the Secretary's entering into contracts not specifically identifiable at the time of enactment.[21] Little support can be derived, therefore, from the juxtaposition of mandatory and non-mandatory language in these statutes. *Cf.* Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). At the same time, however, there is no warrant on the face of the authorizing subsections for decrying an intent that the Secretary's authority be used under all circumstances, as appellees would have us hold.

### B. *Statutory declarations of policy and purpose.*

The Secretary draws more affirmative support from other aspects of the statutory texts and from the statutory context within which they were enacted. The most basic statement of congressional housing policy derives from the

---

16. 12 U.S.C. § 1715z(b) provides that "[t]o qualify for assistance payments, the homeowner or the cooperative member shall be of lower income and satisfy eligibility requirements prescribed by the Secretary. . . ." *See* 12 U.S.C. § 1715z–1(e); 12 U.S.C. § 1701s(c). The latter section provides that "qualified tenants" meet both the criteria to be established by the Secretary as well as those set out in the statute.

17. 12 U.S.C. § 1715z(i)(3) (first proviso).

18. 12 U.S.C. § 1701s(f).

19. *E. g.*, in determining a project proposal's acceptability, under such "standards and conditions as the Secretary may prescribe," he "shall give due consideration to the possible effect of the project on other business enterprises in the community." 12 U.S.C. § 1715z–1(j)(5)(A).

20. *Accord,* Statement of William H. Rehnquist, Asst. Atty. Gen., Office of Legal Counsel, in Hearings on Executive Impoundment of Appropriated Funds Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, 92d Cong., 1st Sess. 234 (1971).

21. By way of contrast, consider the situation in which Congress appropriates money in support of a discrete federal project to be administered by the Executive, who is authorized to contract for that purpose. "If Congress appropriates money to build a dam and specifies the timing and nature of its construction, the executive's discretionary power over the expenditure is correspondingly limited." Comment, Executive Impounding of Funds: The Judicial Response, 40 U.Chi. L.Rev. 328, 340 (1973). A contention to the contrary would not be likely of a serious reception. Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838). *See* 22 Op.Atty.Gen. 295, 296, holding mandatory an appropriation act "[t]o enable the Secretary of the Treasury" to make a payment; 21 Op.Atty.Gen. 414, holding that contract authority for the Secretary of War "for such materials and work as may be necessary to carry on continuously the plans of the Mississippi River Commission" permitted non-expenditure of sums authorized for that purpose only "if the work can be done for less."

Housing Act of 1949, which dedicates the nation to "the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family." Section 2, *as amended*, 42 U.S.C. § 1441. In addition to setting the national goal, that Act specifies certain policies to be followed in its attainment,[22] and imposes the following obligations on the executive agencies:

> The Department of Housing and Urban Development, and any other departments or agencies of the Federal Government having powers, functions, or duties with respect to housing, *shall exercise their powers, functions, and duties under this or any other law, consistently with the national housing policy* declared by this Act and in such manner as will facilitate progress in attaining the national housing objective hereby established, *and in such manner as will encourage and assist* (1) the production of housing of sound standards of design, construction, livability, and size for adequate family life; (2) the reduction of the costs of housing without sacrifice of such sound standards; (3) the use of new designs [etc.] and the increase of efficiency in residential construction and maintenance; (4) the development of well-planned, integrated, residential neighborhoods and the development and redevelopment of communities; and (5) stabilization of the housing industry at a high annual volume of residential construction.

[Emphasis supplied.]

■ This statute is not precatory; HUD is obliged to follow these policies. Action taken without consideration of them, or in conflict with them, will not stand, Shannon v. United States Department of Housing & Urban Dev., 436 F. 2d 809 (3d Cir. 1970); Garrett v. City of Hamtramck, 335 F.Supp. 16, 26 (E. D.Mich.1971); *see* Talbot v. Romney, 334 F.Supp. 1074, 1079 (S.D.N.Y.1971), although there is, of course, broad discretion in the agency "to choose between alternative methods of achieving the national housing objectives." *Shannon, supra*, 436 F.2d at 819.[23]

In addition to these general policies that must guide the Secretary in the discharge of all his housing functions, the programs involved in this suit each bear a statement of congressional purpose that is equally binding on the Secretary in administering the particular program. Thus, Section 235 was enacted "[f]or the purpose of assisting lower income families in acquiring homeownership"; Section 236, "[f]or the purpose of reducing rentals for lower income families"; and Section 101, for the benefit of "qualified tenant" groups as therein defined. These expressions of intent unquestionably obligate the Secretary to administer the programs in a manner reasonably well-calculated to assist their intended beneficiaries,[24] and the exercise of such discretion as he has must be directed to that end. The real question here is whether the Secretary has the discretion, or indeed the obligation, to suspend the programs' operation when he has adequate reason to believe

---

22. These policies include primary reliance on private enterprise, government assistance where feasible to enable private enterprise to meet more of the need than would otherwise be possible, encouragement of local planning authorities, and government assistance to slum clearance and rural housing efforts. The policy of maximum reliance on "private enterprise and [on] individual self-help techniques" was affirmed in Section 2 of the 1968 Act, 12 U.S.C. § 1701t.

23. The same observations may be made concerning HUD's obligations under Title VIII (Fair Housing) of the Civil Rights Act of

1968, 42 U.S.C. § 3608(d)(5), to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies" of the United States respecting nondiscrimination in housing, as declared at 42 U.S.C. § 3601. *See* Otero v. New York City Housing Auth., 484 F.2d 1122, 1133–1134 (2d Cir. 1973); U. S. Comm'n on Civil Rights, Understanding Fair Housing 7 (Clearinghouse Publ. No. 42, Feb. 1973).

24. Findrilakis v. Secretary of Dept. of HUD, 357 F.Supp. 547 (N.D.Cal.1973); Mandina v. Lynn, 357 F.Supp. 269 (W.D.Mo.1973).

that they are not serving Congress's purpose of aiding specific groups in specific ways, or are frustrating the national housing policies applicable to all housing programs. We think he has this limited discretion.

When the Secretary has evidence sufficient to convince him that particular housing programs have come into conflict with the overall housing policy or the program goals set by Congress, and that administrative correctives within his power to take have not or will not resolve the conflict, his dilemma is acute.[25] Appellees suggest that the only course then open to him is the familiar one of continuing to administer the programs as well as can be done, and to report the difficulty to Congress.

However usual it may be for the Executive to follow that course under other conditions, it would be unreasonable to conclude, absent a clear indication, that it is a requirement of the laws relevant to these particular circumstances. If the programs are indeed disserving congressional policy, their continued operation at normal levels for the nine-month period deemed necessary for their evaluation would implicate the Secretary in a massive frustration of that policy. Commitments made under these programs may obligate the federal government, irrevocably, to make very substantial outlays for as many as forty years. In the normal course of a nine-month period, commitments could be expected to involve hundreds of thousands of housing units[26] and billions of dollars.[27] A court is properly reluctant to conclude that Congress forbade the Secretary to withhold commitments of so vast a magnitude when he has good reason to believe that exercising his authority would be contrary to the purposes for which Congress authorized him to act.

### 1. HUD Act of 1968

Appellees suggest that the HUD Act of 1968, whence Sections 235 and 236 derive, provides the clear indication we deem necessary to their case. In that Act Congress reaffirmed the national housing goal of "a decent home and a suitable living environment for every American family," and stated its belief that the goal could be achieved within a decade "by the construction or rehabilitation of twenty-six million housing units, six million of these for low and moderate income families." 42 U.S.C. § 1441a. In addition to enacting substantive programs in aid of this goal, it directed the President to develop and transmit a ten-year plan for achieving the goal, 42 U.S.C. § 1441b, and to report annually on progress toward the

25. The Secretary has previously had occasion to suspend the Section 235 program pending extensive administrative reforms and investigation. HUD Secretary's Statement on Section 235 Program, Jan. 14, 1971, 1 CCH Pov.L.Rep. ¶ 2800.81. See Hearings on HUD-Space-Science-Veterans Appropriations for 1973 Before a Subcomm. of the House Comm. on Appropriations, 92d Cong., 2d Sess., pt. 3, at 69–70 (1972).

26. During fiscal year 1973, the latter half of which covers six of the nine months' suspension, Section 235 production was targeted at 165,000 units, Section 236 at 175,000 units, and Section 101 at 20,000 units. Fourth Annual Report on National Housing Goals, H.Doc.No.92–319, 92d Cong., 2d Sess. 44 (1972).

27. The Congress has authorized the Secretary to make contracts that commit the United States to paying up to $2,248 million per year for the three programs taken together. See note 14 supra. On January 8, 1973, the Secretary had unused obligational authority of $431 million. In a letter to Senator Sparkman dated November 8, 1973, he reported that authority still unused as of June 30, 1973, totaled $360.8 million.

It is important to bear in mind that the budgetary impact of each commitment made is felt over the life of the project approved. The actual cost of using a dollar of obligational authority therefore depends upon the length of the commitment. Thus, whether a dollar of authority is used to enter a ten-year or a forty-year contract, remaining contract authority is reduced by only one dollar although the actual run-out cost is $10 in the former instance and $40 in the latter. With less than $2 billion of contract authority obligated, therefore, it is estimated that the run-out cost of the programs is already $85.7 billion. HUD, Housing in the Seventies at 4–23, Table 6 (1973).

objective he had set for the particular year. 42 U.S.C. § 1441c. In his annual reports, the President is directed to compare the results of the previous year with the objective set for that year and, in the event of a shortfall, state the reasons therefor, steps being taken to prevent its recurrence, and any necessary revision of the remaining annual objectives; and, in light of experience, to "make recommendations with respect to any additional legislative or administrative action which is necessary or desirable to achieve the objectives of the plan."[28]

The Executive's reporting function under the 1968 Act reflects, as appellees suggest, the Congress's determination to oversee closely the nation's progress in attaining its housing goal, and attests to the importance assigned to that goal.[29] Requiring annual progress reports and inviting legislative proposals bespeaks a willingness to take corrective action that experience indicates to be "necessary or desirable to achieve the objectives of the plan." At the same time, however, delegation of the planning function gives the Executive a considerably broader mandate than otherwise to evaluate the programs independently and, to the end of achieving the goal expressed in the 1968 Act in terms of a specific number of housing units, to determine the mix of authorities to be used, within the au-

thorization ceilings set by Congress. While the Congress and the President alike no doubt expected that the authority would be used or carried forward, as with unused authority in prior years,[30] the policy and planning provisions of the 1968 Act are surely not a basis for inferring that Congress intended that it be used notwithstanding later events or information that cause the Executive to believe its use might undermine the integrity of the statutory national housing policy.[31] On the contrary, that Act indicates a greater than average degree of reliance on, and discretion in, the branch charged with developing the ten-year plan and carrying it out as best it can.

### 2. The congressional response.

The legislative history of the 1965 and 1968 Acts is, not surprisingly, unenlightening on the precise question before us. When Congress establishes a new program, however novel or untested, it does not normally express itself on the question of what the executive officer charged with its administration should do if and when he has reason to believe that it is frustrating the policies he is obliged to serve. In such unanticipated circumstances, it becomes the duty of a court to construe the relevant statutes in a manner that most fully effectuates the policies to which Congress was committed.[32] We are not, however, en-

28. His other reporting obligations are to project mortgage market conditions and analyze monetary and fiscal policy with reference to the objective of the ten-year plan for the forthcoming particular year.

29. See Section 2 of the 1968 Act, 12 U.S.C. § 1701t, assigning the "highest priority and emphasis . . . to meeting the housing needs of those families for which the national goal has not become a reality."

30. See S.Rep. No. 1123, 90th Cong., 2d Sess. 27 (1968).

31. Cf. Fisher, Presidential Spending Discretion and Congressional Controls, 37 Law & Contemp.Prob. 135, 171 (1972):
Appropriations are made many months, and sometimes years, in advance of expenditures. Congress acts with imperfect knowledge in trying to legislate in fields that are highly technical and constantly

undergoing change. New circumstances will develop to make obsolete and mistaken the decisions reached by Congress at the appropriation stage. It is not practicable for Congress to adjust to these new developments by passing large numbers of supplemental appropriation bills. Were Congress to control expenditures by confining administrators to narrow statutory details it would perhaps protect its power of the purse but it would not protect the purse itself. Discretion is needed for the sound management of public funds.

32. "The axiom that courts should endeavor to give statutory language that meaning that nurtures the policies underlying legislation is one that guides us when circumstances not plainly covered by the terms of a statute are subsumed by the underlying policies to which Congress was committed." United States v.

tirely without congressional guidance, beyond the inferences to be drawn from the statutes themselves, in the unusual circumstances of this case.[33] And the congressional response to the decision of January 8 does not suggest that we err in our reading of the statutes to confer a limited discretion to suspend the programs.[34]

On January 29, 1973, the President submitted his 1974 budget proposals to Congress, and urged enactment of new legislation emphasizing an alternative approach to achieving the national housing goal. No funds were requested for the suspended programs. In March the Housing Subcommittte of the House Committee on Banking and Currency

held a hearing on the suspension at which Secretary Lynn and Under Secretary Hyde explained the basis for the action.[35] During the course of that hearing a few members questioned the degree to which mismanagement accounted for the situation giving rise to the suspension but, significantly, not a single member drew in question its legality, even inferentially.[36]

The Housing Subcommittee did not recommend special legislation to order resumption of the programs, but two items relevant to the programs were soon to come before the Congress: extension of the insuring authority of the Federal Housing Administration, including its authority for Sections 235 and

Sisson, 399 U.S. 267, 297–298, 90 S.Ct. 2117, 2133, 26 L.Ed.2d 608 (1970).

33. In some instances "the most revealing legislative expressions" of intent occur not in legislative history but in response to events subsequent to enactment. New York State Dept. of Social Services v. Dublino, 413 U.S. 405, 416 n. 19, 93 S.Ct. 2507, 2514, 37 L.Ed. 2d 688 (1973) (statements by committee chairmen in response to three-judge court decision construing legislation they had considered); Dotson v. Butz, slip op. at 11 (D. D.C.Civ.Action No. 1210–73, Aug. 3, 1973).

34. The House Rules Committee recently analyzed the problems involved in judicial resolution of "impoundment questions." Impoundment Control and 1974 Expenditure Ceiling, H.Rep.No.93–336, 93d Cong., 1st Sess. 5 (1973). It feared the potential for error when a court "examine[s] the intent of Congress, perhaps imperfectly expressed, when it enacted an appropriation or obligational authority in some previous year. Any court must face considerable difficulty in deciding what Congress means in 1973 when it has to construe a measure enacted in 1970." As a result, the Committee feared that the court's own policy judgments "about relative spending priorities in the context of current needs and economic conditions" might color its decision. In this case, the unusual extent to which Congress has clarified its intent, as detailed below, and the Committee's own efforts in alerting the courts to this problem, give reason to hope that we have not fallen prey to this particular frailty.

35. Hearings on the Moratorium on Subsidized Housing Before the Subcomm. on Housing of the House Comm. on Banking and Cur-

rency, 93d Cong., 1st Sess. (1973) (Comm. Print).

36. The only questions of legality raised related to the cancellation, on February 14, 1973, of outstanding preliminary reservations of contract authority under Section 235, and feasibility letters under Section 236, except where the sponsors had obtained a conditional commitment by February 13. Id. at 55–57 (questions 4(b) and 5(b) submitted in writing to the Secretary and inserted in the record with his answers).

In contrast is the Report of the Subcomm. on Priorities and Economy in Government of the Joint Economic Comm., Housing Subsidies and Housing Policy 5 (March 5, 1973) (Comm. Print), which, although issued after the January 8 suspension, was based on research and hearings prior thereto. The majority suggested that the suspension "and similar announcements affecting other programs" raise the most serious constitutional issue . . . ." They recognize[d] the need for some executive discretion in the management of federal funds" but objected vehemently to any substantial failure to implement programs for which Congress has authorized and appropriated funds. It is apparent, however, that they viewed the suspension as directed at the control of inflation, id., and not at "the questions which have arisen concerning the effectiveness of subsidized housing programs," which had been the Subcommittee's concern in holding hearings. Id. at 3. Since it is established for purposes of this litigation that the suspension was "program related," see text at notes 12–13, supra, the Subcommittee's opposition to it cannot be taken as endorsing the view that the relevant statutes prohibit a suspension for any reason under any circumstances.

236, which was due to expire at the end of the fiscal year; and the HUD appropriation for 1974.

### a. *The House*

The House approved a one-year extension of insuring authority by House Joint Resolution 512 on May 21.[37] The report of the Committee on Banking and Currency, Temporary Extension of Certain Housing and Urban Development Laws and Authorities, H.Rep.No.93–206, 93d Cong., 1st Sess. 2 (1973), explained Section 1 of the resolution:

> This section includes extension of authority for the sections 235 (home-ownership) and 236 (rental) housing programs which have been temporarily suspended by the President. Approximately $400 million in contract authority is available for use by the Administration, pending its review and evaluation of Federal housing subsidy programs.
>
> . . . Extension of these programs for one year will enable the President to reactivate these programs during Fiscal Year 1974. . . .

Two members of the Committee expressed their separate view "that enactment of this bill should in no way imply an acquiescence" in the housing subsidy moratorium. *Id.* at 15. But the "acquiescent" tenor of the passage quoted first, and endorsed by the other thirty-eight Committee members, takes on added significance in light of the Committee's other recommendations. For example, the President had purported to terminate the open space land program on January 5, and in his Budget proposed to terminate other community development programs as of June 30, and to replace them with a special revenue sharing act (the "Better Communities Act"). The Committee, however, citing transitional problems that local governments would experience by a funding hiatus between June 30 and eventual enactment of a new program, recommended appropriation of new monies for four of the programs, including the open space land program. Its intention that this money be spent to alleviate the problems it described could not have been clearer, nor more in contrast with its handling of the Section 235 and 236 programs. Again, with respect to Section 701 of the Housing Act of 1954, the comprehensive planning grant program that the Administration proposed to replace, the Committee reported (at 4):

> The Committee will give careful consideration to the substantive legislation to be submitted by the Administration. However, until the Congress completes action on such a proposal, it is the Committee's intent that funds appropriated pursuant to this authorization [$110 million] be utilized under the existing comprehensive planning program, with reasonable levels of support made available to existing program recipients.

The point here is not that the House committee with responsibility for oversight of the suspended housing programs failed to inveigh against the suspension, much less insist upon their resumption. Rather, the point is that, with its intimate knowledge of the Acts creating the programs, it did not view the suspension as being beyond the Executive's power under the statutes. The Committee did not necessarily "acquiesce" in the sense of accepting the suspension as necessary or desirable, but it certainly appears to have accepted its legality.

In June, before the Senate had yet acted on House Joint Resolution 512, the House Committee on Appropriations reported out, and the House passed, the 1974 appropriations for HUD.[38] The bill contained no new contract authority for the suspended housing programs. The report on the bill related that the

---

37. 119 Cong.Rec. H3795 (daily ed.) (357 to 1).

38. H.R. 8825, reported June 19, 1973, H. Rep.No.93–296, 93d Cong., 1st Sess., passed,

119 Cong.Rec. H5237 (June 22, 1973, daily ed).

President had suspended five housing programs and "terminated" one housing, seven community development, and two community planning and management programs. The Committee "commended" HUD for undertaking the housing evaluation announced on January 8, but questioned the necessity of the suspension, as follows (at 5):

> If the results of the evaluation conclude that subsidized housing programs are inherently unworkable, the Committee will consider alternate proposals of [sic] providing low and moderate income housing. However, a total suspension without the results of the evaluation is a harsh approach, and it would seem that a more moderate, humanitarian and logical alternative should have been pursued.

The Committee said that it had "been alerted to substantial hardships incurred due to the suspensions," referring to the plight of some sponsors, and therefore urged the Secretary and the President "to end the suspension of housing programs at an early date."

The Committee took a distinctly different view of the "termination" of the community development and planning programs, and the distinction did not turn on the difference between termination and suspension. Expressing "great concern" over termination of the community development programs, it said, "Until modified or repealed by the Congress, the Committee directs that these programs be continued." H.Rep.No.93–296 at 6. The budget had requested only "a token amount of $137,500,000 for these programs," but the Committee provided $820,000,000 for them, 119 Cong.Rec. H5191 (June 20, 1973, daily ed.), and directed that it be used. With respect to the community planning and management programs, for which there were unexpended no-year funds of $15.6 million—as there were available funds for the suspended housing programs—the Committee provided no new money, but said (at 6):

> The Committee directs that the program of new community assistance grants be continued instead of being terminated as proposed in the budget estimate.

No similar direction relating to the housing programs appears, either as a statement of current congressional sentiment or as an interpretation of the requirements of existing law.[39]

b. *The Senate.*

The Senate was clear in expressing its disagreement with the Executive over the *wisdom* of the housing suspension, but did not question its *legality.* The Senate Committee on Banking, Housing and Urban Affairs reported out House Joint Resolution 512 with amendments, accepted by the Senate, to increase the Secretary's contract authority under Section 236,[40] and to require the Secretary "to utilize the [*new*] contract authority or other funds appropriated during the fiscal year" for a number of suspended programs including Sections 235, 236 and 101.[41] The HUD appropriations bill, H.R. 8825, was also

---

39. In addition, while there was extended floor debate on the community development appropriation and the propriety of adding mandatory spending language to the bill itself, no similar concern about the housing programs was expressed. Indeed only Representatives Abzug and Holtzman challenged the legality of the housing subsidy moratorium, and this on constitutional grounds. 119 Cong.Rec. H5209–10. It is clear, at least in Mrs. Abzug's case, that this was done only after rejecting the bona fides of the Secretary's reasons for suspension. See note 36, *supra.*

40. S.Rep.No.93–272, 93d Cong., 1st Sess. 6 (June 28, 1973). New authority was includ-

ed for Section 236 alone only because "[t]he FHA Section 235 and rent supplement programs [had] adequate carry-over authority to maintain last year's program level." *Id.* at 2.

41. The Committee was of the opinion that the Executive lacked constitutional authority to suspend the programs, which measure it characterized as an effort "to control inflation." *Id.* at 7. It gave no indication as to whether there was statutory authority to suspend them for program-based reasons. *See* note 36, *supra.* The House, in any event, rejected the amended version, and recommitted the resolution to conference. 119 Cong.Rec. H5718–23 (Sept. 5, 1973, daily

amended in committee to require obligation of *new* contract authority only.[42] As to the prior unused authority involved in this suit the Committee merely urged HUD, "[i]f the study presently being conducted by [HUD] . . . indicates that it would be feasible to restore the rent supplement program," to do so as soon as possible and "not necessarily wait for completion of the aforesaid study." The same course was urged respecting Sections 235 and 236.[43] Obviously, this approach suggests not that the suspension was unlawful, but rather that the Committee proposed to make further non-expenditure prospectively unauthorized.[44]

The absence of suggestion in Congress's response to the housing subsidy moratorium that the Executive lacked authority to suspend the programs for program-based reasons is not without significance. Of greater weight, however, are the detailed responses of the various committees with responsibility for housing programs and their funding, each of which regarded the suspension as at most unwise and some of which did so at the time that they rejected outright executive initiatives to suspend, terminate, or phase out other programs.

We emphasize that Congress's failure to enact mandatory spending legislation in response to the Executive's decision to withhold authorized funds is not and cannot be the basis, in any degree, for an inference that it did not intend in the first instance to preclude executive discretion to suspend the programs. Congress may make its adherence to an original intent unmistakable by further legislation, or by overriding a presiden-

tial veto, *see* City of New York v. Train, 160 U.S.App.D.C. 114, 494 F.2d 1033, cert. granted, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 557 (1974), but it cannot be put to the necessity of acting twice before it is taken to mean what it said in duly enacted legislation. We have examined Congress's response to the executive action here challenged only for the light it might shed on its original intent in establishing these three housing programs.

■ That response is corroborative of the inference of discretion in the Secretary reasonably to be drawn from the statutes and their contexts; and we hold that, in the circumstances revealed by this record, the Secretary is not without authority to suspend the Section 235, 236 and 101 programs.

## IV

When this case was before the District Court, the only administrative decision to be challenged was the Secretary's order of January 8, and it should have been reviewed on the basis of the information then available to the Secretary. During the pendency of this appeal, however, the program evaluation initiated by the Secretary was completed,[45] and on the basis of that evaluation he determined that operation of one program should be resumed and that operation of the three programs with which this case is concerned should not be. Since the relief sought is immediate resumption of the programs, it would be futile indeed to determine now whether the original suspension decision was an abuse of discretion when made. If the later decision against resumption was not an abuse of

ed.) ; *see id.* at S16376 (Sept. 12, 1973, daily ed.).

42. S.Rep.No.93–272, 93d Cong., 1st Sess. 4 (June 28, 1973) (Comm. on Appropriations).

43. *Id.* at 5, 6.

44. The bill was amended on the Senate floor to require the use of sums previously authorized for both community development programs and the three housing programs in question here, 119 Cong.Rec. S12624–47

(June 30, 1973, daily ed.), but neither provision survived the Conference Committee, H. Rep.No.93–411, 93d Cong., 1st Sess. (1973), and neither these provisions nor the proposed prospective mandate appears in the enacted legislation, P.L. 93–137, 87 Stat. 491.

45. Housing in the Seventies, *supra* note 27. Part 1 of the report, which contains a description and analysis of all federal housing activities, was lodged with this court per our order of November 2, 1973.

discretion, a court of equity would not order resumption of the programs because they had been initially suspended wrongfully, nor, if the later decision was abusive, withhold relief because the original suspension was not. The question has necessarily become the reasonableness of the final decision itself.[46] This change in circumstances does not require that the case be remanded, however. The housing program study on which the termination was based is before the court. Together with other matters on the public record, it provides support for the Secretary's exercise of discretion of a sort that is not diminished for the lack of adversarial testing.[47]

▮ Since the discretion vested in the Secretary is a narrow one, and the potential for mischief in the event of its abuse great, it is natural for a court to extend its inquiry somewhat beyond the "rational basis" that elsewhere suffices to support an administrative decision under 5 U.S.C. § 706. This is not to say that the court is empowered to substitute its judgment for that of the Secretary, for it is not. Rather, "the ultimate test is reasonableness." Brawner Building, Inc. v. Shehyn, 143 U.S.App. D.C. 125, 130, 442 F.2d 847, 852 (1971). Our inquiry, therefore, is not merely into whether the Secretary had a rational basis for believing that the programs were disserving Congress's purposes and policies, but whether, having those policies in mind and considering the consequences to be expected from continuing the programs, it was reasonable to discontinue them.

The applicable policy framework may be briefly restated as follows. The national housing objective is the realization as soon as feasible of a decent home and a suitable living environment for every family.[48] "The policy to be followed in attaining the national housing objective established shall be" one of primary reliance on private enterprise, with governmental assistance "utilized where feasible to enable private enterprise to serve more of the total need." HUD is directed to exercise its powers consistently with the national housing policy and so as (1) to produce physically and socially sound housing (2) in an economical manner (3) with increased efficiency of construction and maintenance; (4) to encourage "the development of well-planned, integrated residential neighborhoods"; and (5) to stabilize the housing industry "at a high annual volume of residential construction." 42 U. S.C. § 1441.

More particularly, the rent supplement program was enacted for the benefit of those of the "8 million Americans who still live[d] in substandard housing" as of 1965 and the "estimated 300,000 families who [would] be displaced from their homes over the next four years" who "are within the income range where they are unable to afford decent housing," H.Rep.No.365, 89th Cong., 1st Sess. 6 (1965), defined as those whose incomes make them eligible for public housing. 12 U.S.C. § 1701z(c)(1). Sections 235 and 236 were enacted to assist "lower income families," specifically "families with incomes in the general range of $3,000 to $7,000,"[49] and the

46. Consequently, the subsidiary question of whether the Secretary abused his discretion or acted arbitrarily in refusing to accept or process applications for subsidy up to but not including the issuance of commitments, thereby minimizing disruption of the "pipeline" in the event that the programs were resumed, is a question mooted by the later decision to terminate them, and we do not address it.

47. See 1 K. Davis, Admin. L. Treatise § 7.06, at 430 (1958).

48. As quantified in 1968, this objective became a goal of "twenty-six million housing units, six million of these for low and moderate income families." 42 U.S.C. § 1441a.

49. Congress set no minimum income on eligibility for Section 235 or 236 subsidy, but did set a maximum expressed in terms of 135% of the "maximum income limits which can be established in the area . . . for initial occupancy in public housing dwellings." Twenty per cent of the payments made under each program could be for families with

Secretary was directed to "accord a preference to those families whose incomes are within the lowest practicable limits." 12 U.S.C. §§ 1715z(h)(2), 1715z-1(i)(2).[50] Under each program it was expected and intended that the amount of subsidy per family would decline as annual family income increased. H.Rep.No.1585, 90th Cong., 2d Sess. 8, 22 (Tables) (1968).

There are two questions to be asked with respect to each of the three programs. First, was the program consistent in operation with the national housing policies and the purposes for which Congress enacted it? Second, if it was not, was the inconsistency reasonably attributable to the program's structural features as opposed to the manner of its administration? Each is, of course, a question of fact, but the latter implicates the Secretary's judgment in a way that calls for some deference; it is, in short, a question of discretion. We take the programs up individually with these questions at hand.

A. *Section 235* [51]

As of the end of 1972, just before the program was suspended, 398,000 home mortgages had been insured under Section 235, in the amount of $7.0 billion.

The actual net addition to the housing stock is estimated at 14,000 for every 100,000 subsidized units, primarily because of the finite amount of mortgage money available. The median mortgage amount per unit was $18,500, and the mean only slightly lower, but an inordinate number of units have been poorly built and deteriorate rapidly. The rate of default and abandonment in some neighborhoods has been extremely high, and the rate of failure within ten years for the entire program is projected at 16%.

The statutory maximum mortgage amount ranged from $18,000 to $24,000 depending on family size and area construction costs.[52] Construction costs being lower in the South, these maxima have tended to concentrate Section 235 housing in that region. Almost 49% of all Section 235 units are located in the southern states, where 25% of the United States population, and 30% of the households with incomes in the targeted $3,000 to $7,000 range, live. In contrast, HUD Region II, consisting of New York, New Jersey, Puerto Rico, and the Virgin Islands, is the site of only 3.8% of the Section 235 units, although it has 13.7% of the population and 12.4% of

incomes in excess of that figure but less than ninety per cent of the income limit prescribed by the Secretary for occupants of projects financed with mortgages insured under 12 U.S.C. § 1715*l*(d)(3) and (5).

50. The Congress's intent to concentrate homeownership (and rental) subsidies among lower income beneficiaries is unambiguous. The Administration-supported bill, H.R. 17989, which passed the House, had provided for "Homeownership for Low and Moderate Income Families." The Senate bill was enacted after the Conference Committee had substituted much of the House language, but it retained the Senate description of Section 235, "Homeownership for Lower Income Families." The Congress had already amended the Administration bill by adding income eligibility maxima, and the Conference Committee further tightened these, and added the provision last quoted in the text and another directing the Secretary to report semiannually to a committee of each house on the income levels of families receiving a subsidy. The Conferees also amended the

provision for insurance of mortgages executed by non-profit sponsors to finance the purchase, rehabilitation, and resale of homes so as to exclude any but lower income vendees. *See* 12 U.S.C. § 1715z(j)(4)(A).

51. The following information relating to the three programs is drawn from the Secretary's study, Housing in the Seventies, *supra* note 27, unless otherwise indicated. The study was conducted under the direction of the Assistant Secretary for Policy Development and Research by more than one hundred analysts drawn from throughout the Executive Branch and organized into five study teams. Information was solicited and received from members of Congress and committee staffs, public and private interest groups, and the general public pursuant to a notice in the Federal Register. 38 Fed.Reg. 8685 (Apr. 5, 1973); extended, 38 Fed.Reg. 14302 (May 31, 1973).

52. 12 U.S.C. 1715z(b)(2) (third proviso) (1970), amending 12 U.S.C. 1715z(b)(2) (third proviso) (Supp. IV, 1968).

those in the $3,000 to $7,000 income group.

The distribution of Section 235 units by household income shows that 37.3% have incomes in excess of $7,000, of which 18% are above $8,000 and 2.1% above $10,000. Fewer than one-half of one per cent have incomes below $3,000. More significant is the distribution within the $3,000 to $7,000 range. With every increase (in 000s) in income within that group, the percentage of Section 235 units increases. Moreover, with one exception, the annual subsidy per unit is constant or *increases* with every $1,000 increase in family income. The average family with an income below $3,000 receives an annual subsidy of $720; one between $3,000 and $4,000, $768; and one with an income in excess of $10,000 receives $864.[53]

The reason that the subsidy increases with income derives from the formula by which it is calculated. The homeowner's housing cost is limited to twenty per cent of his income so long as that does not create an effective mortgage rate of interest less than one per cent. Higher income families within the eligible group tend to purchase larger homes, and twenty per cent of their larger incomes not only buys more housing, it also attracts a larger and larger subsidy until they reach the one per cent effective rate plateau. Indeed, although the twenty per cent limitation more often applies to higher income families, for families at every income level it creates

an incentive for builders to emphasize larger, more expensive homes, and for families to buy them because they are indifferent to additional cost below the point where they begin to share the burden of marginal price increments.

This curious incentive structure also exacerbates the plight of Section 235 homeowners facing increases in taxes and insurance. Once the subsidy limit has been reached, they must bear these increases alone. Partly. as a consequence of this, the projected final default rate of 18.6 per cent may be unrealistically low, in which case the Section 235 mortgage insurance fund is actuarially unsound.

As previously noted, Congress intended Section 235 benefits to accrue "to those families whose incomes are within the lowest practicable limits," 12 U.S.C. § 1715z(h)(2), and intended the per unit subsidy to decline as family income increased. The actual distribution of Section 235 subsidy by region and especially by income group is not consistent with the former purpose, and of course the tendency of the subsidy amount to increase with family income runs directly counter to congressional intent.

HUD's administration of Section 235 has been subjected to intensive internal and congressional scrutiny and criticism in recent years,[54] and administrative reforms aimed at improving program results have been attempted.[55] Some of the points of conflict between the program's actual operation and the general

---

53. Measured in terms of the total subsidy paid to households in an income class and spread among all households in that income class, the subsidy increases with every increase of $1,000 income from $3,000 to $7,000 and then declines. The subsidy to families in the $3,000 to $4,000 group, for example, is $.19 for each such family in the country. For the succeeding targeted income groups, the figures are $1.52, $7.70, $18.03, and $20.83. The subsidy paid per household in the $7,000 to $8,000 group was $14.80; in the $8,000 to $10,000 group, $6.-71; and above $10,000, $.21.

54. *E. g.*, 3 1973 Appropriations Hearings, *supra* note 25, *passim*; Surveys and Investiga-

tions Staff, House Comm. on Appropriations, Report, in *id.* at 1294, 1316–25; Staff of the House Comm. on Banking and Currency, Investigation and Hearing of Abuses in Federal Low and Moderate Income Housing Programs, 91st Cong., 2d Sess. (1970); Housing Subsidies and Housing Policy, *supra* note 36; General Accounting Office, Report to the Congress: Opportunities to Improve Effectiveness and Reduce Costs of Homeownership Assistance Programs (B–171630, Dec. 29, 1972).

55. *See* 3 1973 Appropriations Hearings, *supra* note 25, at 8–15 and *passim*.

directive to HUD, 42 U.S.C. § 1441, would seem to be amenable to administrative correction.[56] Better appraisal and inspection procedures, for example, could be expected to facilitate the production of sounder housing, and uninflated prices would lead to fewer failures, with their deleterious effect on neighborhoods.

■ But the operating results that conflict with Congress's intentions specific to Section 235 do not appear to be of a sort amenable to administrative correction. Indeed, a recent congressional study that reiterated the need for administrative improvement recommended legislative reconsideration of the statutory income criterion tied to local public housing income ceilings and of the nationally uniform statutory maximum mortgage amount, in order to correct the unintended regional and income distribution of Section 235 subsidies. Congressional Research Service, An Analysis of the Section 235 and 236 Programs, Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking, Housing and Urban Affairs, 93d Cong., 1st Sess. 12 (May 24, 1973) (Comm. Print). In view of the limited potential for administrative correction of these deviations from the congressionally intended operation of the program and the apparent degree to which unanticipated and unintended results have been linked to its structural features, we are unable to say that the Sec-

retary acted unreasonably in terminating rather than continuing the program.

### B. Section 236

The Secretary's study made three crucial findings about the operation of Section 236. First, the program provides a rent subsidy "mainly to moderate-income households." Second, the annual subsidy tends to increase with family income. Third, the average Section 236 unit costs 20% more to construct than a comparable unit privately financed. In addition, the ten-year projected default rate of 20% indicates that the program insurance fund is actuarially unsound.

One hundred and forty-two thousand units had been constructed with Section 236 financing when the program was suspended, and three times as many more had been issued fund reservations or obligations of contract authority unaffected by the suspension. The median mortgage amount was $16,700 per unit. Sixty-two per cent of the completed units had been sponsored by corporations or partnerships organized for profit.[57]

Sponsors have a strong interest in serving families with a larger and steadier income. In addition to regarding such families as socially more desirable to the project, they are clearly more desirable tenants from a financial point of view. Since all tenants must pay at least the "basic rent," i. e., their share of operating expenses plus amortization at an assumed one per cent, by themselves,[58] tenants with a larger in-

---

56. Certain problems, such as inadequate inspections, inflated appraisals, and official corruption, all of which increase the rate of failures and divert government monies intended for homeowners to builders and mortgagees, are clearly problems of administration. The structure of Section 235 may create incentives for these abuses, but it does not put them inexorably beyond the reach of corrective action by the administrator.

57. Section 236 housing may be built by profit, nonprofit, or cooperative enterprises. A profit-making enterprise is limited to a six per cent cash return on investment, but realizes substantial additional tax benefits during the development of the project. Certain

construction period expenses ordinarily of a capital nature are immediately deductible. Accelerated depreciation of the project cost basis generates a tax loss that can shelter other income. This effect is magnified by the high loan-to-value ratio available, enabling a smaller than conventional equity investment to leverage a higher ratio of depreciable basis to equity. Furthermore, the forty year amortization period loads the early year payments with a greater component of deductible interest than obtains under conventional 20–25 year financing.

58. Tenants pay the greater of the "basic rent" or 25% of their adjusted incomes but no more than the "market rent," composed

come are better able to absorb increases in the basic rent, which increases as operating expenses rise. This reduces the rate of turnover, with its attendant costs to management (and thus to other tenants).

Most families in the program receive the maximum benefit, which is the whole of the difference between the market rent and the basic rent.[59] The size of this difference and therefore of the subsidy is a function of per unit land and construction costs. The result of this formula for subsidy is for higher cost projects to serve higher income tenants and for those tenants to receive a correlatively larger subsidy, and for lower cost projects to serve lower income families who receive a smaller subsidy.

The construction costs of Section 236 units are on average twenty per cent higher than for comparable unsubsidized[60] units, and rents are at least ten per cent higher.[61] The subsidy formula provides an incentive to sponsors to overbuild,[62] and even to overstate actual costs, see Survey and Investigations Staff, Report, in 3 1973 Hearings, supra note 25, and HUD's cost control procedures have been unable to deter this practice. According to the congressional staff report just cited, which placed the percentage of units erected by profit-making sponsors at 68%, the only motivation for many sponsors was the tax shelter benefit available during the early years of the project's life. "Once the tax shelter benefits have been realized by the 236 sponsor, the project becomes a counterproductive investment to the sponsor. At this point in time the sponsor will probably sell his project or return the project to HUD if he is unable to sell the project to another investor." Id. at 1309.

As of March 31, 1972, Section 236 mortgages totalling $572 million, or 26% of the total amount then outstanding, were in default. Id. at 1314. By the time of the program's suspension, HUD owned six and held assigned mortgages on sixty projects. None had then been sold, but based on experience under the Section 221(d)(3) below market interest program, HUD expected an average loss of 45% of acquisition costs, and a turnover period of up to three years during which time operating costs would exceed market rents (i. e., rental receipts including the intended subsidy portion thereof). With a projected ten-year default rate of 20% and a final rate of 30% or more, the program's mortgage insurance fund is inadequate.

There is hard evidence on the public record that some of the financial problems HUD encountered with Section 236 were attributable to its own failure adequately to supervise the private entrepreneurs on whom the program was designed so heavily to rely.[63] While the tendency to overbuild and the fraud associated with inflated cost accountings, for example, may reflect some sponsors' responses to incentives created by the program design, there is no reason to

---

of operating expenses, amortization at the FHA ceiling rate, and the mortgage insurance payment. The amount of subsidy is the difference between the market rent and what the tenant is paying.

59. HUD Office of Audit, Report on Audit of Section 236 Multifamily Housing Program (05-02-2001-5000, Jan. 29, 1972) (Exhibit 2) reported that 85.05% of tenants paid only the basic rent and thus received the maximum subsidy, while only 1.54 per cent paid the full market rent.

60. The actual cost of Section 236 housing, taking account of tax revenue foregone in order to induce sponsorship by taxable sponsors, would of course increase the disparity.

The estimated revenue cost discounted to present value is $1,446 per unit.

61. If adjusted to reflect neighborhood quality the disparity would have been greater.

62. Apparently some projects include swimming pools and apartments with amenities such as dishwashers. Survey and Investigations Staff, Report in 3 1973 Appropriations Hearings, supra note 25, at 1310.

63. See id., at 1315; General Accounting Office, Report to the Congress: Opportunities to Improve Effectiveness and Reduce Costs of Rental Assistance Housing Program (B-171630, Jan. 10, 1974); HUD Office of Audit, supra note 59.

suppose that they were necessarily beyond the reach of administrative prevention, and the Secretary does not claim otherwise. On the other hand, the program's reliance on private enterprise appears to be inherently in tension with the Secretary's mandate to concentrate its subsidies among the lowest income families in the range of those eligible, since sponsors cannot be prevented from renting to eligible tenants concentrated at the high end of that range.[64] The tendency of higher income families to draw larger subsidies seems equally to be based upon the program design itself, but is nonetheless contrary to the way in which Congress intended Section 236 to work.

The incentive system that concentrates the sponsor's benefits in the early years of the program may also be a virtually insurmountable obstacle to the goal of building sound housing. There is little reason for a sponsor to concern itself with whether the housing it constructs will last for even the life of the insured mortgage, and every incentive to look to the short term with the idea of turning the project over to HUD when the benefits have been exhausted.

While the court cannot determine whether the structure of Section 236 made even these results inexorable, the relationship is sufficiently plausible that we have no basis for saying the Secretary acted unreasonably in terminating the program on the ground that he could not administer it consistently with congressional intent.

## C. *Section 101*

■ The rent supplement program is not a housing construction program at all. Rather, it offers a subsidy to tenants in certain units in projects constructed under other programs, notably the Section 221(d)(3) market rate program, the Section 236 program, and state and local housing construction assistance programs. The continued vitality of the Section 101 program is, therefore, dependent in the first instance upon the continued operation of the underlying construction programs onto which it is piggybacked.

Appellees in this case each proposed to sponsor either Section 235 or Section 236 projects, and Section 101 was implicated with respect to at least some of the latter. No appellee concerned itself with sponsoring projects under any other program to which Section 101 might be conjoined. Appellees did, however, sue on behalf of all others "similarly situated," and were certified by the District Court as proper representatives of their class.

■ While there is some ambiguity in that court's description of the intended class,[65] we do not see how the class can properly be held to include would-be sponsors of projects under programs other than Section 236 but to which Section 101 might apply, none of whom are parties to this case. Insofar as Section 101 applies to sponsors under other programs, it is impossible to say that common questions of law are present. If the Secretary is refusing to entertain

64. *Cf.* Mandina v. Lynn, 357 F.Supp. 269 (W.D.Mo.1973).

65. The court conceptualized the relevant class as being composed of "all those who have participated in efforts to obtain nondiscriminatory access of minority and low and moderate income persons to statutorily created housing subsidy, mortgage loan insurance and rent supplement programs and particularly those applicants or potential applicants for Section 235, 236, or 101 subsidies whose applications have not been or will not be processed, or who have been or will be deterred from filing such applications because of the suspension order of January 8."

Past participation in efforts to obtain nondiscriminatory subsidized housing is clearly not sufficient to establish standing for present equitable relief. *Cf.* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L. Ed.2d 636 (1972). More importantly, the district court erred in its use of the disjunctive respecting "applicants for Section 235, 236 *or* 101 subsidies." There can be no applicants under Section 101 who are not *also* applicants or sponsors under another program; in this case, that other program must be Section 236.

applications under those programs, it is a question of law arising under different statutes as to whether it is within his power or discretion to do so. Insofar as Section 101 applies to Section 236 sponsors, their concern with the former program necessarily terminated with the latter. Accordingly, since we interpret the class determination in this case to reach only those would-be Section 101 sponsors involved with Section 236 applications, there is no longer any justiciable controversy as to them in light of our previous ruling with respect to Section 236. *See* Mintz v. Mathers Fund, Inc., 463 F.2d 495 (7th Cir. 1972). ˙

Reversed.