COOPERATIVE SERVICES, INC., et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al., Defendants.

Civ. A. No. 74–831.

United States District Court, District of Columbia.

Jan. 16, 1976.

Florence Wagman Roisman, Washington, D.C., for plaintiffs.

Paul M. Tschirhart, Asst. U. S. Atty., Washington, D.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WADDY, District Judge.

This action was brought against the United States Department of Housing and Urban Development (HUD) and James T. Lynn, individually and in his capacity as Secretary of HUD, seeking declaratory and injunctive relief from HUD's alleged unlawful "impoundment" of the revolving loan fund created by Section 202 of the Housing Act of 1959.

Plaintiffs are Cooperative Services, Inc. (CSI), a non-profit corporation and consumer cooperative chartered under the laws of the State of Michigan, and seven named plaintiffs. The action was conditionally certified by order of this Court as a Class Action under Fed.R. Civ.P. 23(b)(1)(A) and (b)(2), the class consisting of: (a) all persons on the waiting list for CSI Section 202 housing not yet built; and (b) all CSI members on the waiting list for CSI housing. Plaintiffs seek relief from HUD's general refusal to process, approve, implement and fund applications for Section 202 funding, and more particularly, as to those 202 applications CSI has previously submitted to HUD.

Plaintiffs' claim is that the Section 202 program was terminated by HUD, not for acceptable program-related reasons, but rather because it was a direct loan program creating too heavy a burden on the Budget. Defendants deny the Section 202 funds were unlawfully impounded and argue that HUD terminated the program because it was consistent with Congress' intent; that the Section 236 program created by the Housing and Urban Development Act of 1968 was better able to make an immediate impact on housing needs; that the 202 program was an inefficient use of federal funds; and that the 236 program encouraged development of private financing with potentially greater resources.

The case came on for trial and was heard by the Court sitting without a jury. Having considered the evidence adduced at trial, the stipulations of fact, the briefs submitted by the parties, the oral arguments of counsel and the entire record herein, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The Section 202 program was created by Section 202 of the Housing Act of 1959, 73 Stat. 667, 12 U.S.C. § 1701q, which authorized HUD to make direct, low-interest, up to 50-year loans to non-profit corporations to provide housing and related facilities for the elderly. Between 1959 and 1968, Congress made

various changes in the program: in 1961 it added consumer cooperates to the class of eligible sponsors; in 1964 it specified that the program could be used for the permanently handicapped as well as the elderly; in 1965 it fixed the interest rate at not more than three percent per annum.

2. The 202 program was initially designed as a supplement to two other programs for providing housing for the elderly; the low-rent public housing program and the FHA Section 231 "unsubsidized" program. Section 202, administered by the Community Facilities Administration of the Housing and Home Finance Agency, was to serve modest-income elderly families and individuals whose incomes were above the eligibility limits for low-rent public housing, but too low to enable them to afford the rents charged in elderly projects insured under the FHA program.

3. Initially, in 1959, Congress authorized an appropriation of $50 million dollars for the Section 202 housing program. By fiscal year 1971, the cumulative authorization level for the program was $650 million dollars. By fiscal year 1971 Congress had appropriated a cumulative figure of $465 million dollars.[1]

4. The Section 202 program was financed by means of a revolving loan fund. Congressional appropriations and receipts from the interest and principal on outstanding 202 loans were placed in the fund and made available for new 202 projects. Although Congress made no appropriations for Fiscal Years 1970,[2] 1972, 1973 and 1974, the unreserved balance in the Section 202 fund has steadily increased.[3]

5. Under the Section 202 program, a qualified sponsor submitted an application to HUD for funding. The applicant was required to show that it was "unable to secure the necessary funds from other sources upon terms and conditions equally as favorable as the terms and conditions applicable to loans under [Section 202]."[4]

6. The 202 program was popular with the elderly persons of modest income who were residents of the projects. There was no scandal associated with 202. The income group that the program served was the income group it was intended to serve. The program operated at low unit cost compared to public housing. In the entire history of the 202 program, only two projects have ever gone to foreclosure. It was considered one of the more effective of the housing assistance programs.

7. The National Housing Goals as set forth in the Housing and Urban Development Act of 1968 declared as housing policy, the production of 26 million housing units over a ten-year period. In 1971 the White House Conference on Aging set the housing goal for the elderly at a minimum of 120,000 units per year.

8. On two occasions, the Executive asked Congress not to fund the 202 program. In 1960, the Administrator asked that no appropriation be made, arguing the program was

> unsound and unwise * * * because of its use of a hidden interest rate subsidy; because of the excessive mortgage term—50 years— . . .; and because of its reliance on general tax funds to do this job, instead of developing and encouraging private financial support.

Congress nevertheless appropriated $20 million for Section 202 in 1960. Again, in 1966, the Administration asked Congress to "phase-out" Section 202 in favor of rent supplements; Congress did not

---

1. Plaintiffs' Exhibit No. 51.

2. Although Congress made no appropriation for Fiscal Year 1970, the legislative authorization for that year was $150 million dollars.

3. The unreserved balance at the end of each of the Fiscal Years pertinent to this action was as follows: FY 1969, $2.4 million; FY 1970, $11.2 million; FY 1971, $58.9 million; FY 1972, $73.3 million; FY 1973, $93.6 million; and approximately $115 million as of December 31, 1974. Plaintiffs' Exhibit No. 51. Testimony, John M. Frantz, Tr. 31–33.

4. 12 U.S.C. § 1701q(a)(2).

do so.[5] This request originated with the Bureau of the Budget which had a standing objection to the use of direct loan programs because of their annual budget impact.[6]

9. The Housing and Urban Development Act of 1968 created the Section 236 interest reduction program, 12 U.S.C. § 1715z–1. Under Section 236, housing projects were constructed with private financing obtained at market rates. The Federal Government subsidized the payment of interest by the sponsor-mortgagor, thereby permitting tenants to pay reduced rentals. The interest rates could be reduced as low as one percent per annum. The Section 236 program was identified as

> . . . intended to replace . . . the program of direct 3 percent loans for the elderly and handicapped authorized under section 202 of the Housing Act of 1959, but only after the new program is fully operational and fully funded. It will be better able to serve lower income tenants because of the rents attainable under it will be lower than those possible under the other two programs [Section 202 and Section 221(d)(3) BMIR programs]. S.Rep.No. 90–1123, 90th Cong., 2d Sess., 23 (June 25, 1968). (Underscoring supplied).

10. In that same year Congress also appropriated $25 million for Section 202 and made changes in the program, such as allowing for-profit as well as nonprofit organizations to sponsor Section 202 programs. Applications representing approximately 34,000 housing units were then pending at HUD for Section 202 funding.

11. After Congress passed the 1968 Housing and Urban Development Act,

HUD was authorized to fund projects under both Section 202 and Section 236, it being Congress' intent that Section 202 would be gradually phased-out only when the new Section 236 program was fully funded and fully operational.

12. HUD, however, stopped funding projects under Section 202 after the enactment of the Section 236 program, but before the 236 program was fully operational. The termination occurred sometime during calendar years 1969 and 1970, and by the beginning of Fiscal Year 1971 (July 1, 1970), the Section 202 program had been completely phased out and no new 202 applications were being accepted.[7] Where sponsors' applications already were pending, HUD required that the projects be converted to the new Section 236 program. When sponsors attempted to apply for funding new 202 projects, HUD told the sponsors that no 202 applications were being accepted because no 202 funds were available. This was an inaccurate representation. With the exception of Fiscal Year 1970, Congress continued to appropriate funds for the 202 program every year up to and including Fiscal Year 1971. At the close of Fiscal 1971, the unreserved balance in the 202 revolving fund was 58.9 million dollars and the unreserved balance has continued to increase.[8] It took between eighteen months and two years to fully implement the new Section 236 program.[9]

13. The cost per housing unit to the Federal Government was less under the Section 202 direct loan program than under the Section 236 interest subsidy program. Under the 202 program the entire amount of the loan was required to be reported in the Budget for the first year of the loan. In contrast, under the

---

5. Stipulated Statement of Facts and Issues, ¶ 4.

6. Testimony, John M. Frantz, Tr. 15–16.

7. Testimony, Arthur E. Rosfeld, Tr. 108–114; Albert J. Kliman, Tr. 293, 307.

8. See note 3, supra.

9. Testimony, John M. Frantz, Tr. 68–69, 74–75; Arthur E. Rosfeld, Tr. 139–40.

As of June 30, 1974 some 48,804 Section 236 housing units had been approved and were under reservation and 33,773 units had been completed. Another 27,133 Section 202 units converted to Section 236 were under firm commitments. "Specialized Housing and Alternatives to Institutionalization," *Hearings before a Subcommittee of the Committee on Government Operations*, House of Representatives, 93rd Cong., 2d Sess., 420 (1974).

236 program, only the amount of the interest subsidy for that fiscal year was required to be included in the Budget even though the total dollar commitment for comparable projects was greater under the 236 program.

14. The average basic monthly rents in Section 236 units are generally lower for most tenants than in Section 202 units. There are, however, 202 projects in which rents are comparable to those in 236 projects; as well as individual situations in which tenants pay more than the basic 236 rent.[10]

15. HUD continued in its refusal to fund any Section 202 projects into 1975. CSI and other sponsors and others concerned with providing housing for the elderly have attempted to persuade HUD to implement the 202 program.

16. The Senate Report on the Housing and Urban Development Act of 1969 expressed strong dissatisfaction with the abrupt termination of the 202 program which it termed:

> . . . the result of a misunderstanding of the 1968 legislation which authorized the section 202 sponsors to convert to section 236 on a voluntary basis, not on a mandatory basis. S.Rep.No.91–392, 91st Cong., 1st Sess., 415 (1969), U.S.Code Cong. & Admin. News 1969, pp. 1524, 1543.

The Conference Committee Report on the 1969 Housing Act further endorsed the Section 202 program, stating:

> The conferees want to emphasize their strong support for this valuable program [section 202] . . . [and] their understanding that conversion to section 236 was intended to be voluntary on the part of the sponsor and that there was no intention that sponsors be required by administration regulation to convert their projects. Conf.Rep.No.91–740, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Admin. News 1969, pp. 1579, 1585.

17. The Housing Act of 1969, Pub.L. No.91–152, 83 Stat. 390, increased by $150 million the amount authorized to be appropriated for Section 202. For Fiscal Year 1971, Congress appropriated $10 million for the 202 program.

18. During calendar years 1970 and 1971, CSI submitted applications to HUD for four projects to be built in the Detroit area for funding under Section 202. CSI was stipulated to be a good sponsor who had produced good buildings in the past and who managed these buildings in an efficient and effective way.

19. As to three of these projects (Allen Park, Madison Heights and Dearborn Heights), CSI received letters from the HUD regional office in Chicago certifying that each was acceptable in concept and would be eligible for Section 202 funding, but rejecting each as 202 projects because funds were not available.[11] Each of these applications was returned to CSI with the recommendation that the project be re-submitted under Section 236. During 1971, all three were re-submitted as Section 236 projects.

20. As to the fourth project, Riverview, a formal Section 236 application was submitted to HUD on July 20, 1972 after CSI had been advised by HUD that no Section 202 funds were available.

21. None of the four projects sought by CSI was ever funded because HUD suspended the Section 236 program on January 5, 1973.[12]

22. For a fifth project, Kalamazoo, CSI submitted a preliminary application (a "Statement of Housing and Demand") to HUD for Section 202 funding during 1968. This application was never formally rejected and no application for Section 236 funding was ever submitted to HUD.

23. Although the Section 202 program was not high volume,[13] the pro-

---

10. Defendants' Exhibit No. H. Plaintiffs' Exhibit No. 36.

11. Plaintiffs' Exhibits Nos. 42, 43, and 46.

12. The authority of then Secretary Romney to suspend the Section 236 program was upheld in *Commonwealth of Pennsylvania v. Lynn*, 163 U.S.App.D.C. 288, 501 F.2d 848 (1974) and is not challenged herein.

13. Through June 30, 1974, some 45,494 Section 202 housing units had been approved and 44,-

gram, within the limits of its resources, was serving national housing goals and accomplishing the purposes Congress had intended it to accomplish.[14] HUD's termination of that program for an alleged unavailability of funds was not for "program related reasons". In refusing to fund 202 projects to the extent and in the manner authorized by Congress, HUD was not promoting national housing policies.

24. After the Section 236 program was suspended in January, 1973, there was no program under which a sponsor for an elderly housing project could obtain financing upon terms and conditions equally as favorable as under Section 202.

25. In 1974, Congress passed the Housing and Community Development Act, Pub.L.No.93-383, 88 Stat. 669, which substantially amended Section 202 by creating a new method of funding the revolving loan fund and setting a new maximum interest rate.[15] The Act also authorized the Secretary of the Treasury to borrow new funds up to a level established by an annual appropriations act. The Supplemental Appropriations Act of 1975, Pub.L.No.93-554, 88 Stat. 1771, provides:

> The limitation on the aggregate loans that may be made under section 202 of the Housing Act of 1959, as amended, from the fund created by subsection (a)(4)(A) of such section, in accordance with subsection (a)(4)(C) of such section as added by section 210(d)(3) of the Housing and Community Development Act of 1974, is hereby established in the fiscal year ending June 30, 1975,

at a level of $100,000,000 in addition to the unobligated balance of the amounts heretofore appropriated to or otherwise deposited in such fund as of the end of month after the enactment of this paragraph.

26. The Congressional intent as to the interest rate to be applied to the unreserved balance of approximately $115 million is ambiguous. In hearings before the Senate on the Supplemental Appropriations for Section 202, Senator Proxmire commented: "As I understand it, the $115 million would be available on a 3-percent basis. The new money would be on the higher level."[16] The Committee on Appropriations, in its report on H.R. 16900, the Supplemental Appropriations Bill, 1975, stated:

> In effect, this will authorize previously appropriated funds to be used in the revised program as provided in the new housing legislation, and is consistent with the Committee's previous urging of the Department to resume the section 202 program, which has been remarkably free of scandal and default problems associated with some other programs. H.R.Rep.No.1378, 93d Cong., 2d Sess. 6 (1974).

▪ 27. Upon consideration of the Statutes establishing and continuing the Section 202 program, 12 U.S.C. § 1701q, as amended, the Housing and Community Development Act of 1974, and the respective legislative history of each, this Court finds that the Housing and Community Development Act of 1974 did not repeal the Section 202 program as it previously existed, so as to preclude the lending of the estimated $115 million in the unreserved balance of the "old" 202

---

242 units completed. An additional 27,601 units were begun under Section 202, but were completed after mandatory conversion to the Section 236 program. *Hearings before a Subcommittee of the Committee on Government Operations, supra,* note 8.

**14.** Testimony, John M. Frantz, Tr. 41–42; Arthur E. Rosfeld, Tr. 105–107.

**15.** 12 U.S.C. § 1701q(a)(3) provides in pertinent part: "A loan under this section . . . shall bear interest at a rate which is not more

than a rate determined by the Secretary of the Treasury taking into consideration the current average market yield on outstanding marketable obligations of the United States with remaining periods to maturity comparable to the average maturities of such loans, adjusted to the nearest one-eighth of 1 per centum, plus an allowance adequate in the judgment of the Secretary to cover administrative costs and probable losses under the program."

**16.** at 1142–1147.

program at the interest rate of 3 percent per annum.

28. On January 20, 1975, the Secretary announced the release of $215 million [17] in Section 202 funds for construction loans at the current market yield on outstanding Treasury obligations plus an allowance to cover administration and probable loans.

29. On January 21, 1975, CSI resubmitted the Allen Park, Madison Heights, Dearborn Heights, Riverview and Kalamazoo projects to HUD for Section 202 funding.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this suit and the parties hereto.

■ 2. HUD did not terminate the 202 program nor impound the Section 202 revolving fund for such program-related reasons found appropriate in *Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 501 F.2d 848 (1974). The termination and impoundment of Section 202 funds were therefore unlawful.

■ 3. The immediate and mandatory conversion by HUD of Section 202 applications to the Section 236 program and the impoundment of 202 funds was in contravention of Congress' intent and an abuse of discretion.

■ 4. The Secretary further abused his discretion after the lawful termination of the Section 236 program in January of 1973 when HUD continued to refuse to fund Section 202 projects.

■■ 5. This Court has broad discretionary power as a court of equity to grant appropriate relief in this case. *Porter v. Warner Co.,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1945); *Mitchell v. Demario Jewelry,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1959). "And it is a well-established prerogative of the Court to treat as done that which should be done." *Commonwealth of Pennsylva-*

*nia v. Weinberger,* 367 F.Supp. 1378 (D.D.C.1973).

■ 6. Nor does the doctrine of sovereign immunity, as recently enunciated by the Supreme Court in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) restrict this Court from granting plaintiffs relief herein.

7. Plaintiffs and the class they represent are entitled to a judgment declaring unlawful the termination of the Housing Program established pursuant to Section 202 of the Housing Act of 1959, as amended, and the impoundment of the funds presently remaining in the revolving loan fund created by said Act.

■ 8. Plaintiffs and the class they represent are likewise entitled to a judgment requiring defendants to give appropriate notification to plaintiffs and all members of the class of the availability of funds for the purposes of Section 202 of the Housing Act of 1959, as amended; and further requiring defendants to promptly review existing applications, and to accept and promptly review applications hereafter made for funding under Section 202 of the Housing Act of 1959, and to obligate such funds to the extent of the amount of the unreserved balance in the revolving fund on the effective date of the Housing and Community Development Act of 1974 in accordance with the standards and procedures applicable prior to the unlawful termination of said 202 program.

## JUDGMENT

This action came on for trial before the Court sitting without a jury, and upon consideration of the testimony of the witnesses, the exhibits, and the entire record herein, and the Court having concluded that plaintiffs are entitled to judgment in this action in accordance with the Findings of Fact and Conclusions of Law filed herein on this same day, it is by the Court this 16th day of January, 1976,

17. 375 million dollars, including the approximately $115 million at issue herein, is currently available for Section 202 loans.

DECLARED, ORDERED AND ADJUDGED:

1. That this action be, and the same hereby is, certified as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1)(A) and (b)(2), the class consisting of: (a) all persons on the waiting list for Cooperative Services Section 202 housing not yet built; and (b) all Cooperative Services members on the waiting list for CSI housing.

2. That defendants' termination of the Housing Program established by Section 202 of the Housing Act of 1959, as amended, and the impoundment of the Section 202 revolving loan fund was unlawful.

3. That defendants be, and hereby are, enjoined from further unlawful impoundment of the revolving loan fund established by said Act.

4. That defendants give appropriate notification to plaintiffs and their class of the availability of funds for the purposes of Section 202 of the Housing Act of 1959, as amended, to the extent of the amount of the unreserved balance in the revolving loan fund on the effective date of the Housing and Community Development Act of 1974.

5. That defendants promptly process and review all pending applications of plaintiffs and their class for funding under Section 202 of the Housing Act of 1959, as amended, and make obligations thereunder to the extent of the amount of the unreserved balance in the revolving fund on the effective date of the Housing and Community Development Act of 1974 in accordance with the standards and procedures applicable prior to the unlawful termination of said 202 program.

6. That defendants accept any further applications of plaintiffs and their class under Section 202 of the Housing Act of 1959, as amended, and promptly process and review them, and make obligations to the extent of the amount of the unreserved balance in the revolving fund on the effective date of the Housing and Community Development Act of 1974 in accordance with the standards and procedures applicable prior to the unlawful termination of said 202 program.

7. That defendants shall promptly implement disbursement of Section 202 funds to successful applicants.

8. That the relief granted herein shall in no way prejudice plaintiffs' position with respect to applications that may now be pending, or that may be filed in the future, for the funding of any project, either under the terms of Section 202, as revised by the Housing and Community Development Act of 1974, or any other housing program.

9. That plaintiffs are not entitled to recover attorneys' fees of defendants.

10. That judgment be, and the same hereby is, entered for plaintiffs and against defendants.