COOPERATIVE SERVICES, INC., et al.

v.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al., Appellants.

No. 76–1193.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 19, 1977.

Decided Aug. 15, 1977.

As Amended Sept. 2, 1977.

David M. Cohen, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U.S. Atty., and Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellants.

Florence Wagman Roisman, Washington, D. C., for appellees.

Before WRIGHT and LEVENTHAL, Circuit Judges, and GESELL,* District Judge.

Opinion for the court *per curiam.*

Dissenting opinion filed by LEVEN-THAL, Circuit Judge.

## JUDGMENT

This cause came on to be heard on the record on appeal from the United States District Court for the District of Columbia and was argued by counsel.

This case was tried in the District Court on the basis of a formal pretrial stipulation agreed to by all parties. *See Cooperative Services, Inc. v. U.S. Dept. of Housing & Urban Development,* 410 F.Supp. 865 (D. D.C. 1976). Given that stipulation, the findings and conclusions of the District Court are correct. They are hereby affirmed. Given the legislative changes since the events in suit here, however, the complete remedy ordered by the District Court is inappropriate if not impossible at this time. Under the circumstances,

It is ORDERED by this court that this case is hereby remanded to the District Court with instructions to order appellants to file with the District Court a plan which in appellants' judgment provides an appro-priate resolution of this case given the fact that the merits have been decided in favor of appellees. In preparing the plan appellants should consult with appellees in an effort to arrive at a fair and equitable result. If the plan proposed by appellants is not acceptable to the District Court, that court will order its own remedy, subject to appeal to this court in any event.

*So ordered.*

LEVENTHAL, Circuit Judge, dissents from the judgment.

PER CURIAM:

The facts of this case are set forth at length in both the opinion of the District Court, see *Cooperative Services, Inc. v. U.S. Dept. of Housing & Urban Development,* 410 F.Supp. 865 (D. D.C. 1976), and the dissent, see dissenting op. 183 U.S.App.D.C. at ——–——, 562 F.2d at 1296–1297, and we will not rehearse them here.

██ This case was tried under a pretrial stipulation entered pursuant to Rule 16, Fed.R.Civ.P. Such stipulations may be modified only "to prevent manifest injustice" and no such showing of injustice has been offered or made here. *Id.* The stipulation sought a determination by the District Court of whether HUD's Section 202 housing program was terminated for "program related" reasons within the meaning of *Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 501 F.2d 848 (1974). While we share some of the dissent's concerns about whether *Lynn* is really apposite, the District Court correctly understood that the Secretary of Housing and Urban Development was authorized by the Housing Act of 1968 to phase out the Section 202 program in favor of the Section 236 program created by that Act, "but only after the new program [Section 236 was] fully operational and fully funded." S. Rep. No. 1123, 90th Cong., 2d Sess. 23 (1968), *quoted in Cooperative Services, Inc. v. U.S. Dept of Housing & Urban Development, supra,* 410

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1970).

F.Supp. at 869 (Findings ¶ 9). The parties were in disagreement concerning whether Section 236 was "fully operational and fully funded"; evidence was introduced on that point; and the District Court concluded that "HUD * * * stopped funding projects under Section 202 after the enactment of the Section 236 program, but before the 236 program was fully operational." 410 F.Supp. at 869 (Findings ¶ 12). Neither the Government nor the dissent suggests that this finding was "clearly erroneous," Rule 52(a), Fed.R.Civ.P., on the record before the trial judge, and clearly it is not.

The Government argues, however, that we should take judicial notice of certain materials that could have been introduced at trial but were not and, on the basis of these materials, that we should find that Section 236 was adequately implemented and funded at the date of HUD's termination of the Section 202 program. See dissenting op. at ——, 562 F.2d at 1299 n.12. We cannot accept such a novel theory of error.

 The dissent similarly concludes that there has been no showing that the Secretary abused his discretion in phasing out the Section 202 program when he did, arguing that any such review must be based on an administrative record which the plaintiffs have failed to place in evidence. See dissenting op. at ——, 562 F.2d at 1299 n.12. Undoubtedly, judicial review of administrative action should normally be based on the "full administrative record" that was before a decisionmaker at the time challenged action was taken and not on a de novo review of the facts in the District Court. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–421, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In this case, however, the Government did not offer any administrative record, if indeed there is one. Instead it stipulated to a de novo trial of the issues. Compare id. at 420, 91 S.Ct. 814. It is of course true that the burden of coming forward with the administrative record is normally on the party seeking review of ad-

ministrative action. But if there is no administrative record or if, as here, for reasons it deems sufficient the Government chooses not to produce what record there is and agrees to a trial de novo instead, in the absence of proof, or even a suggestion, of "manifest injustice," that decision should not be permitted to prejudice appellees. Rule 16, Fed.R.Civ.P. Only the Government knows what information was before the administrative decisionmaker, and thus only the Government can assemble the record and make it available to the court and to the parties. It did not do so. Finally, since the Government has yet to make any reference to anything in the administrative record, even on appeal, that would support its arguments in this case, we may safely assume that the record, if disclosed, would either support appellees' case or at least fail to detract from the evidence in their favor which is already in the record of this litigation.

 We add one final word concerning relief. Unlike the dissent, we do not think that the 1974 amendments to Section 202 in any way limit HUD's authority to make loans at a three percent interest rate up to an amount equal to that in the Section 202 revolving fund as it existed on the date of amendment. This fund was not borrowed from the Treasury, but came from preexisting appropriations and loan repayments made by earlier Section 202 recipients. For this reason, and because Section 202 as amended does not purport to establish any minimum rate of interest that must be charged, we see no basis for merging this fund with monies to be borrowed from the Treasury for the purpose of limiting relief in this suit. On the other hand, the effect of the 1974 amendments is to limit the funds that will be available in the future at a three percent interest rate. Yet the relief granted would apparently give the whole three percent fund to plaintiff Cooperative Services, Inc. (CSI) without regard to whether the elderly people it represents are the most needy at the time or the only potential claimants to such funds. In addition, at oral argument and in supplemental

briefs filed with this court it appeared that CSI would not be able to create an effective housing program unless it could also get certain rent subsidy monies which HUD averred were in very limited supply. Accordingly, we are not at all sure that the relief granted is either equitable or effective, and we therefore remand this case to the District Court with directions that it require HUD to come forward with a proposal that will as far as it is possible (within the constraints of limited funds and equitable claims of equal strength) put the elderly represented by CSI in the position they would have been in had Section 202 funds not been wrongfully denied in the first place. For example, one possibility would be for the parties to agree to limit the class to those who were on the waiting list for CSI Section 202 housing not yet built at the time this suit was filed in the District Court.

LEVENTHAL, Circuit Judge, dissenting:

After Congress enacted the § 236 program of interest subsidies for low-cost housing, the Department of Housing and Urban Development decided to terminate direct 3% loans under the § 202 program for the elderly. Plaintiff in this action challenged that decision on the ground that HUD lacked a program-related reason for discontinuing the § 202 program. Subsequently, Congress enacted a new version of the § 202 program, which provided for loans at a much higher rate of interest. Nevertheless, the district court held that the older version of § 202 loans had been improperly terminated, and granted to plaintiff broad equitable relief. The panel's order affirms the district court's finding of liability and its requirement that HUD loan federal funds to plaintiff at rates much lower than are available under the current version of § 202.

I believe that congressional enactment of the § 236 program of interest subsidies provided reasonable grounds for discontinuing the § 202 direct loan program. The Secretary acted within his discretion in phasing out one program as the other was phased in. Further, I believe that relief is precluded by the current statutory framework for the § 202 program, which mandates a much higher rate of interest. For these reasons, I dissent.

## I.

The essential facts of this case are set out in Judge Waddy's findings. In 1959, in order to provide low cost housing for elderly persons of modest income, Congress created the Section 202 program.[1] It authorized the federal government to make direct loans at low interest to qualified sponsors of appropriate housing projects. As the loans were paid back, the money was placed in a revolving fund. A 1965 amendment fixed the minimum interest rate at 3% per annum.[2]

In 1968, Congress created a new program designed to produce housing for the elderly and other groups—the Section 236 program.[3] Significantly, this was not a direct loan program; instead the federal government subsidized interest payments on privately financed housing. After the sponsor had obtained a private loan, the U.S. Government insured the mortgage, and then undertook to pay all mortgage interest in excess of 1%. In exchange, the sponsors of the projects promised not to charge their tenants rents above certain predetermined amounts.[4]

Some time after passage of the 1968 Act, the Department of Housing and Urban Development stopped processing new appli-

1. The statutory reference is to Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q. In 1964, the program was expanded to cover housing for the permanently handicapped.

2. Pub.L. 89–117, Title I, § 105(b)(1), 79 Stat. 457 (1965), amending 12 U.S.C. § 1701q(a)(3).

3. Section 236 appears in the Housing and Urban Development Act of 1968, P.L. 90–448, 82 Stat. 498, codified at 12 U.S.C. § 1715z–1.

4. For a more complete description of the Section 236 program, see Commonwealth of Pennsylvania v. Lynn, 163 U.S.App.D.C. 288, 289–90, 501 F.2d 848, 849–50 (1974).

cants for the Section 202 program, and instructed potential sponsors, such as the plaintiff, to submit applications under the Section 236 program instead. This discontinuation of the Section 202 program occurred sometime during calendar years 1969–1970, but Judge Waddy's findings do not specify a date.

Several years later, in 1973, the Section 236 program was found by HUD to be unworkable, and was lawfully suspended. *See Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 501 F.2d 848 (1974).

Finally, in 1974, Congress passed a statute which was intended to revitalize the Section 202 program.[5] HUD was authorized to borrow from the Secretary of the Treasury sums which were to be added to those in the Revolving Fund. Then HUD was to make Section 202 loans at a rate of interest not greater than a rate determined by the Secretary of the Treasury, taking into consideration such factors as the cost to the United States of borrowing the money on the capital market, and an allowance for administrative costs and probable losses under the program.[6]

Plaintiffs in this action include a nonprofit sponsor of low cost housing, Cooperative Services, Inc., ("CSI") and the class of persons who would live in housing built by that sponsor. CSI submitted a number of applications for § 202 projects prior to termination of the program. Three of these were resubmitted as § 236 applications and were accepted and funded under that program. Three applications that were certified as feasible under § 202 were resubmitted under § 236, but not funded before that program was suspended. And a seventh application, which did not have § 202 certification, similarly failed to gain § 236 funding

before termination.[7] At the time the § 236 program was suspended, CSI was also thinking about some 14 additional projects, which had not reached a form in which they could be submitted.

CSI filed this lawsuit in June, 1974, contending that HUD had terminated the § 202 program without a program-related reason for doing so. On the theory that its rights had "vested" prior to termination of the program, CSI asked for and obtained broad injunctive relief from the district court. The decree requires that HUD "promptly process and review all pending applications of plaintiffs and their class for funding under Section 202 of the Housing Act of 1959, as amended, . . . in accordance with the standards and procedures applicable prior to the unlawful termination of said 202 program."[8] HUD was also required to "accept any further applications of plaintiffs and their class" and "promptly process and review" them under the same standard.[9] HUD was ordered to make obligations under these projects to the extent of the amount of unreserved balance in the revolving fund on the effective date of Housing and Community Development Act of 1974, which was about $115 million.

The scope of the district court's order is not entirely clear, but it appears to give CSI a right to have processed not only its applications certified or pending at the time the § 202 program was terminated, but also any projects subsequently conceived for which it now desires federal financing. At oral argument plaintiffs' counsel estimated that her client would submit some 10 applications,[10] requesting an average of 6 million dollars apiece, for a total of 60 million dollars.

---

**5.** Housing and Community Development Act of 1974, P.L. 93–383, 88 Stat. 669, amending 12 U.S.C. § 1701q.

**6.** See 12 U.S.C. § 1701q(a)(3) (Supp. V 1975). The language imposing a 3% maximum was repealed.

**7.** Plaintiffs also point to a preliminary application submitted in 1968 under § 202, but not resubmitted under § 236.

**8.** 410 F.Supp. 865, 873 ¶ 5 (D.D.C. 1976).

**9.** 410 F.Supp. 865, 873 ¶ 6 (D.D.C. 1976).

**10.** CSI made applications for 10 projects after the 1974 amendments to the § 202 program.

## II.

The district court's opinion in this case relies heavily on this court's opinion in *Commonwealth of Pennsylvania v. Lynn*, 163 U.S.App.D.C. 288, 501 F.2d 848 (1974). In his crucial conclusion of law the district judge states:

> 2. HUD did not terminate the 202 program nor impound the Section 202 revolving fund for such program-related reasons found appropriate in *Commonwealth of Pennsylvania v. Lynn*, 163 U.S.App.D.C. 288, 501 F.2d 848 (1974). The termination and impoundment of Section 202 funds were therefore unlawful.

*Cooperative Services, Inc. v. HUD*, 410 F.Supp. 865, 872 (D.D.C. 1976).

In my judgment the district court seriously misread and overextended the *Lynn* decision.

In *Lynn*, this court was concerned with HUD's suspension of the §§ 235, 236 and 101 programs, in the absence of any congressional indication that these programs should be discontinued. In that circumstance, we held that the Secretary possessed a limited discretion to terminate the programs if he had "adequate reason to believe that they are not serving Congress's purpose of aiding specific groups in specific ways, or are frustrating the national housing policies applicable to all housing programs." 163 U.S.App.D.C. at 295, 501 F.2d at 855–56. We explained our decision in the following terms:

> When Congress establishes a new program, however novel or untested, it does not normally express itself on the question of what the executive officer charged with its administration should do if and when he has reason to believe that it is frustrating the policies he is obliged

to serve. In such unanticipated circumstances, it becomes the duty of a court to construe the relevant statutes in a manner that most fully effectuates the policies to which the Congress was committed.

163 U.S.App.D.C. at 297, 501 F.2d at 857.

The case before us now presents an altogether different situation. A crucial fact in the record before us is that in 1968 Congress enacted a new program designed to effectuate those policies and benefit those persons previously served by the § 202 program. Plaintiffs concede that this legislation was enacted in response to the Administrator's dissatisfaction with certain aspects of the 202 program, as discussed below. Moreover, the Senate Report accompanying the legislation explicitly identified the relationship between the two programs. The § 236 program was

> ". . . intended to replace . . . the program of direct 3 percent loans for the elderly and handicapped authorized under section 202 of the Housing Act of 1959, but only after the new program is fully operational and fully funded. It will be better able to serve lower income tenants because the rents attainable under it will be lower than those possible under the other two programs [Section 202 and Section 221(d)(3) BMIR programs]."

S. Rep. No. 90–1123, (1968). Thus, we are not dealing with a case in which the need to terminate a particular program was unforeseen by Congress, as in *Lynn*, but rather with a situation in which the executive's dissatisfaction with a program had been brought to the legislature's attention and a new program enacted with directions that it replace the earlier one.[11]

---

11. Plaintiffs cite congressional statements subsequent to the passage of the 1968 Act to show congressional disapproval of HUD's policy of mandatory conversion to § 236. *See* Report of the Senate Banking and Currency Committee on the 1969 Housing Act, S. Rep. 91–392, 91st Cong., 1st Sess. 41 (1969); H. Rep. 91–740, 91st Cong. 1st Sess. (1969) (Conference Report) U.S. Code Cong. & Admin. News 1969, p. 1524. While the substantive committees took a nega-

tive view of HUD's policy, the House Appropriations Committee favored termination of § 202 financing. See Report of House Appropriations Committee on Fiscal 1970 Appropriation for HUD, H. Rep 91–316, 91st Cong., 1st Sess. 18 (1969). This clash of views is reflected in congressional actions with respect to the § 202 program for fiscal 1971, no appropriation was made in fiscal 1970, when the § 202 revolving

Of course, the Secretary did retain some discretion after the passage of the 1968 Act. It was his duty to decide when the § 236 program was "fully operational and fully funded", so that § 202 funding could be discontinued. But plaintiffs have not shown an abuse of discretion. Indeed, they concede that they have not demonstrated who made the decision to terminate § 202 funding, under what circumstances or even in which month it occurred.[12] In the absence of such proof, the district court's finding on this point cannot be sustained.

In my view, then, the only proper holding in this case is that the 1968 legislation gave the Secretary discretion to phase out the § 202 program in favor of the § 236 program at an appropriate time, and that plaintiffs have so far failed to show an abuse of that discretion.

But even if it were necessary for defendants to prove some program-related reason for the discontinuation of § 202 funding, it is quite clear that defendants have met that test. The parties agree that the Administrator sought to replace the § 202 program because it was a direct loan program.[13] Under a direct loan program, the federal government bears the entire capital cost of the project in the first year. In an interest subsidy program such as § 236, however, the federal government assumes responsibility for only a very small part of the cost of the project in the first year, even though its long-term commitment might be equally large. This means that the government could participate in the initiation of far more housing projects in any particular year. In the long run, of course, the government is obligated to turn over substantial sums in order to complete the repayment of these mortgages. But by harnessing private capital, the government could at the outset have a much broader impact on housing starts than would have been possible under a direct loan program using the same congressional appropriation.

This restructuring of the government's efforts to stimulate housing production was surely a sufficient "program-related" reason for terminating one program in favor of another. Although the shift had fiscal ramifications, they were not the kind with which the *Lynn* court was concerned:[14] This was not an example of government

---

fund contained only $2.3 million, and none was made in 1972–74.

In light of this apparent conflict within the Congress, I cannot accept the post-passage statements of some legislators as definitive of congressional intent with respect to the 1968 Act. The most reliable indicators of that Act's purpose are, as I have pointed out, the circumstances surrounding its passage and the accompanying Senate Report, both of which appear to contemplate termination of the § 202 program in favor of the new § 236 design.

12. Plaintiffs' failure of proof with respect to the circumstances surrounding the termination of the § 202 program is compounded by an absence of specific facts in the record concerning the initiation of the § 236 program. Neither party has directed the court to a part of the record which presents statistics concerning the development of the § 236 programs.

Defendant calls the court's attention to figures contained in the 1971 testimony of the Commissioner of the Federal Housing Administration before a subcommittee of the Senate Special Committee on the Aging. He testified that prior to the enactment of § 236, his agency was funding § 202 projects at a rate of approximately 6500 units per year and that by the spring of 1969, it faced a 4–5 year backlog of § 202 applications representing some 35,000 units. By August 1971, however, the agency had funded 28,000 of these under § 236. See "Adequacy of Federal Response to Housing Needs of Older Americans," Hearings before the Senate Special Committee on the Aging, Subcommittee on Housing for the Elderly, 92d Cong., 1st Sess. 118, 123 (1971) (testimony of Eugene Gulledge). Defendants also ask this court to take judicial notice of the HUD Statistical Yearbook for 1973, which is said to indicate that although the amount of § 236 loans approved in Calendar year 1969 was not large, by Calendar year 1970, the total amount of § 236 loans for projects for the elderly was sufficient to finance 11,251 units.

Even without accepting this evidence of the rapidity with which the 236 program developed, it is clear that plaintiffs have failed to carry their burden of proof on these issues.

13. Parties' "Stipulated Statement of Facts and Issues," J.A. at 34 (Feb. 14, 1975).

14. The *Lynn* decision distinguished between "program related" reasons and "reasons of policy—such as fiscal policy—extrinsic to the operation of the programs." 163 U.S.App.D.C. at 292, 501 F.2d at 852.

administrators terminating a program simply to save the money that Congress had ordered spent. Rather, it was a congressionally approved rearrangement of the nation's housing subsidy programs so as to use available funds to accomplish a greater number of projects. I see no warrant for judicial interference with this kind of reorganization. While current expenditures under an interest subsidy program like § 236 may not be fairly reflective of the total long run cost to the government, it is not the role of the federal judiciary to police the budgetary practices or long-term debt obligations of the Federal Government. That is a congressional function, and here it is quite clear that Congress exercised it, and even directed the shift in programs.

### III.

Because the § 202 program was terminated in accordance with the law then in force, I would hold that plaintiffs are not entitled to receive § 202 funding for their applications under that law. A further reason for reaching this result is that the § 202 program has been revised, and that the law currently in force, the Housing and Community Development Act of 1974,[15] contains very different terms and conditions for the extension of § 202 loans.

In rejecting plaintiffs' claim on this alternative ground, I rely on the principle, recently reaffirmed by the Supreme Court, "that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94

---

**15.** P.L. 93–383, 88 Stat. 669, amending 12 U.S.C. § 1701q.

**16.** *Accord, National Consumer Information Center v. Gallegos,* 179 U.S.App.D.C. 120, 549 F.2d 822 (1977).

**17.** *See* 12 U.S.C. § 1701q(a)(4)(B) (Supp. V 1975).

**18.** 12 U.S.C. § 1701q(a)(3) (Supp. V 1975), as amended by the 1974 Act, provides:

(3) A loan under this section . . . shall bear interest at a rate which is not more than a rate determined by the Secretary of the

---

S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974).[16] The origin and justification of the rule are found in Chief Justice Marshall's opinion in *United States v. Schooner Peggy,* 1 Cranch 103, 110, 2 L.Ed. 49 (1801):

It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns, . . . the court must decide according to existing laws.

In the circumstances of this case, that Congress in 1974 deliberately refashioned a major national housing program, we are obliged to apply its current mandate and permit access to § 202 funds only on the terms and conditions specified in the 1974 Act.

Plaintiffs do not disagree with the general principle as stated by the Supreme Court, but rather seek to fall within its exceptions for situations of "statutory direction" or "manifest injustice." As I explain below and in section IV of this opinion, I do not believe that plaintiffs have succeeded in justifying the broad relief they obtained.

The 1974 Act authorized the Secretary of HUD to borrow funds from the Treasury at a rate equivalent to that at which the Treasury could float U.S. obligations on the market.[17] Then HUD would make loans to sponsors of housing for the elderly at a rate of interest "not more than" a rate determined by the Secretary of the Treasury taking into account the current rate of interest on U.S. obligations and the administrative costs and probable losses under the program.[18] The prior 3% maximum for

Treasury taking into consideration the [current average market yield on outstanding marketable obligations of the United States with remaining periods to maturity comparable to the average maturities of such loans], adjusted to the nearest one-eighth of 1 per centum, plus an allowance adequate in the judgment of the Secretary to cover administrative costs and probable losses under the program.

such loans was repealed.[19] Thus the government could charge for its loans the full cost of borrowing capital.

This point was an important one for both the proponents and opponents of the statute. The author of this provision, Congressman Steele, told his colleagues that his version of the § 202 program avoided the "budget pitfall" of the program prior to 1968, "because loans will be made at the Treasury borrowing rate and, therefore, will have little budget impact."[20] An opponent, Congressman Ashley, replied that "contrary to the statements of the author of this amendment, the use of Treasury— rather than 3 percent—loans does not eliminate the budget impact problem . . . [because of] the economic impacts of additional Treasury borrowing."[21] Other opponents of the program argued that the new § 202 program would not be as effective in producing housing as the old one because of the higher interest rate.[22]

In sum, Congress's substitution of a new criterion based on the current cost to the government plainly marked an intent that loans at the costly 3% rate be discontinued.

Plaintiffs contend that the 1974 Act was not, in fact, intended to cover *all* funds in the § 202 program, but only those paid into the revolving fund after enactment. Plaintiffs say that the sum of money contained in the revolving fund prior to the statute's effective date—approximately 115 million dollars—was to be loaned out at the old 3% rate.

I find no support for this contention in the statute's language, purpose or legisla-

tive history. First, the statute does not provide for two different programs, but rather for a single revolving fund. At the time Congress reconsidered the § 202 program in 1974, the pertinent section of the statute provided:[23]

There is authorized to be appropriated for the purposes of this section not to exceed $500,000,000, which amount shall be increased by $150,000,000 on July 1, 1969. Amounts so appropriated shall constitute a revolving fund to be used by the Secretary in carrying out this section.

In revitalizing the § 202 program, Congress did not establish a new fund, but simply expanded the old one. Thus the section quoted above, as amended in 1974, provided:[24]

(4)(A) There is authorized to be appropriated for the purposes of this section not to exceed $500,000,000 which amount shall be increased by $150,000,000 on July 1, 1969. Amounts so appropriated, and the proceeds from notes or other obligations issued under subparagraph (B), shall constitute a revolving fund to be used by the Secretary in carrying out this section.

Second, the floor debates in which this provision was shaped[25] show that Congress intended that all funds—both "old" and "new"—be administered in accordance with the new law. Initially, Congressman St. Germain attempted to add a new section which explicitly provided that funds from the older § 202 program would be consolidated with the new Treasury loans into a single "fund".[26]

19. 88 Stat. 669–671.

20. 120 Cong.Rec. 20285 (June 20, 1974).

21. *Id.* at 20286.

22. *Id.* at 20290 (Remarks of Congressman Moorhead): *Id.* at 20291 (Remarks of Congressman Stanton).

23. 12 U.S.C. § 1701q(a)(4) (1970).

24. 12 U.S.C. § 1701q(a)(4)(A) (Supp. V 1975).

25. The Conference Report explains that the provisions in the compromise bill were taken from the House version, with some differences

not relevant here. H.R.Rep.No.93–1279, 93d Cong., 2d Sess. 168 (1974), U.S.Code Cong. & Admin.News 1974, p. 4273.

26. Congressman St. Germain proposed a new § 211 which provided in pertinent part:

(e)(1) There is established in the Treasury of the United States a trust fund to be known as the National Housing Loan Fund for the Elderly and the Handicapped (hereinafter in this subsection referred to as the "fund"). The fund shall consist of—

(A) amounts repaid by borrowers as principal and interest on loans from the fund;

(B) proceeds credited to the fund under paragraph (3) of this subsection;

There was an objection to this proposal, however, on the ground that the transfer of assets from the revolving fund established in the Housing Act of 1959 to the new national housing loan fund was in contravention of House rules prohibiting reappropriation.[27] The Chair ruled in favor of the point of order.[28] Several minutes later, Congressman Steele offered an amendment which, instead of establishing a new trust fund, amended the existing provision for a revolving fund so that funds borrowed from the Treasury could also be included.[29] In response to a question at the time he offered his amendment, Congressman Steele made clear that it would have the same effect as the St. Germain proposal,[30] a point that was recognized by the amendment's opponents.[31] The Steele proposal was adopted, and is the basis for the current statutory language.

In light of this evidence that all § 202 funds were to be consolidated and distribut-

ed in accordance with the Housing and Community Development Act of 1974, I see no reason to examine the legislative history of any subsequent statutes. But because plaintiffs and the district court rely on some remarks during the passage of the Supplemental Appropriations Act of 1975,[32] I shall briefly examine the legislative history of that statute.

I note initially that the 1975 statute, which sets the limit on the aggregate amount of § 202 loans, does not refer to the existence of two funds.[33] The Report of the House Appropriations committee accompanying the bill stated: [34]

> In effect, this will authorize previously appropriated funds to be used in the revised program as provided in the new housing legislation . . .

The same point was made by a member of that Committee, Congressman Boland, explaining the bill on the floor.[35]

---

(C) all amounts repaid by borrowers as principal and interest on loans from the revolving fund established under section 202(a)(4) of the Housing Act of 1959;

(D) any amounts contained in the revolving fund established under section 202(a)(4) of the Housing Act of 1959 which are not committed on the date of enactment of this subsection; and

(E) receipts from any other source.

All receipts, funds, or other assets and all liabilities of the revolving fund established under section 202(a)(4) of the Housing Act of 1959 (including liabilities arising under loans made under such section) shall become and be assets and liabilities of the fund established pursuant to this subsection, as if such assets and liabilities had been received or incurred pursuant to this subsection, and shall be paid over, held, and accounted for accordingly.

(2) Amounts in the Fund shall be available to the Secretary for the purpose of making loans under section 202 of the Housing Act of 1959 and for paying interest on obligations issued under paragraph (3) of this subsection.

120 Cong.Rec. 20274 (June 20, 1974).

**27.** *Id.* at 20274 (Remarks of Cong. Ashley).

**28.** *Id.* at 20275 (Remarks of Cong. Natcher, the Chairman).

**29.** *Id.* at 20283 (Remarks of Cong. Steele).

**30.** *Id.* at 20284.

**31.** *Id.* (Remarks of Cong. Barrett).

**32.** P.L. 93–554, 88 Stat. 1771 (December 27, 1974).

**33.** Title I of the statute, ¶ 2, provides:

HOUSING FOR THE ELDERLY
OR HANDICAPPED

The limitation on the aggregate loans that may be made under section 202 of the Housing Act of 1959, as amended, from the fund created by subsection (a)(4)(A) of such section, in accordance with subsection (a)(4)(C) of such section as added by section 210(d)(3) of the Housing and Community Development Act of 1974, is hereby established in the fiscal year ending June 30, 1975, at a level of $100,000,000 in addition to the unobligated balance of the amounts heretofore appropriated to or otherwise deposited in such fund as of the end of month after the enactment of this paragraph.

**34.** H.R.Rep.No.93–1378, 93d Cong. 2d Sess. 6 (1974).

**35.** 120 Cong.Rec. 33020 (Sept. 30, 1974). "The new housing bill [the 1974 Act] also reestablished the section 202 housing for the elderly program. The new law requires the approval of lending limits in an appropriation act. To meet this requirement, the committee has recommended language that will, in effect, authorize previously appropriated funds to be used to implement the new legislation. It is estimated that the elderly and handicapped fund cur-

In opposition to this clear and authoritative evidence of congressional intent with respect to the previously appropriated funds, plaintiffs cite three congressional remarks. The first of these occurred during a hearing on the bill, in a colloquy with an Administration witness.[36] Because of its context, it obviously cannot be said to represent the understanding of the Congress.[37] The other two remarks, which appear in the Congressional Record during consideration of the bill, are virtually identical, and are accompanied by papers filed in the district court in connection with this case.[38] Since the substance of the two remarks is expressly contradicted by the Committee Report, and no amendment to the bill was offered, those remarks cannot sensibly be taken as representing the view of the whole House. Moreover, the Supreme Court has warned "post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage." [39] The dangers of relying on the post-passage remarks of individual congressmen are heightened where, as here, the remarks are manifestly directed at contemporaneous litigation.

Thus, plaintiffs have quite clearly failed to show that their case is one in which legislative history or statutory provision directs application of prior law to current controversy.[40]

## IV.

Plaintiffs argue, in the alternative, that their claim is not precluded by the 1974 Act because of the "manifest injustice" of denying them the requested relief. They contend that the federal courts have broad equitable powers to "treat as done what should be done." That proposition is sound enough. *Jacksonville Port Authority v. Adams*, 181 U.S.App.D.C. 175, 556 F.2d 52 (1977). But I find no merit in their claim that their applications should be treated as having been funded before passage of the 1974 Act.

The Supreme Court has noted that it has "refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional." *Bradley v. Richmond School Board*, 416 U.S. 696, 720, 94 S.Ct. 2006, 2020, 40 L.Ed.2d 476 (1974). Since the government had not yet signed contracts with respect to any of the projects involved in this litigation, it is hard to see how it has incurred an "unconditional" obligation. Moreover, even if funds had been

---

rently has approximately $115,000,000 available for lending purposes."

**36.** Supplemental Appropriations for Fiscal Year 1975, Hearings on H.R. 16900 before Subcommittees of the Senate Committee on Appropriations, 93d Cong., 2d Sess. 1142–47 (Remarks of Senators Proxmire and Mathias).

**37.** Senator Proxmire read a letter from an unidentified Washington attorney summarizing the status of this litigation and then stated:

> What we can do, as I understand it, is simply delete in our conference with the House on the supplemental bill the House language with respect to this and make it clear in the committee report language that we intend that 115 million to be loaned out on the basis that we have here, at 3 percent.

*Id.* at 1145–46. The absence of any such language in either the Senate Report, S.Rep.No. 93–1255, 93d Cong., 2d Sess. 8–9 (1974) or the Conference Report H.R.Rep.No.93–1503, 93d Cong., 2d Sess. 5 (1974), indicates that Senator Proxmire was unsuccessful in this endeavor.

**38.** 120 Cong.Rec. 33018 (September 30, 1974) (remarks of Cong. Dingell); *Id.* at 33020 (remarks of Cong. Reuss). Congressman Dingell (D.Mich.) represents the state in which Community Services, Inc. is chartered and in which all of the certified projects were to have been located.

**39.** *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 132, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

**40.** The district court's opinion provides scant support for plaintiffs contentions with respect to legislative intent. It finds only that "The Congressional intent as to the interest rate to be applied to the unreserved balance of approximately $115 million is ambiguous." J.A. at 62. Although statement is labelled a finding of fact, it is palpably a conclusion of law. I would hold it both inadequate to support the judgment and erroneous.

reserved at the time the projects were certified, "a reservation states in terms that it is not an obligation of the United States and it can be cancelled without liability." Tr. at 30 (Testimony of John M. Franz, Budget Director of HUD). Thus I do not agree that plaintiff's rights to funding had "vested" prior to the change in law. But assuming that the certification of a project gives rise to some kind of mature equitable claim on government funds, that should be the very outer limit of the relief granted in this case.[41]

The district court's judgment failed to draw this important line, or for that matter, any other reasonable line. The only limit on the relief available to the plaintiffs is that HUD's obligations under the judgment need not exceed "the amount of the unreserved balance in the revolving fund on the effective date of the Housing and Community Development Act of 1974" or approximately $115 million. This is a phenomenal sum to put at the disposal of a single litigant.

The panel recognizes this problem and remands the case for efforts to seek a more equitable solution. I would agree that this is better than the kind of "windfall" judgment that the district court issued. Yet it is at its core an act of invention. And I would be concerned with any decree that focuses on the "equity" of plaintiffs without taking into account the impact on the needy who would be benefited if the funds were now distributed in accordance with the will of Congress as currently declared.

### V.

Plaintiffs portray this case as one in which an executive department, for purely cosmetic reasons, forsook an excellent program for a disastrous one, and in the process extinguished their vested rights. In fact, the question before the court is not the policy choice between the two programs, but whether the Secretary abused his discretion in terminating a direct loan program for one utilizing interest subsidies. I see no grounds for so holding, and the statutes passed in 1974 effectively ratify his decision and preclude resort to 3% direct loans.

I am of course sympathetic to the goals of this nonprofit sponsor of housing for the elderly. However, the question raised by this litigation is whether plaintiffs will apply for loans along with all other applicants under the most recently established congressional scheme, or whether they shall have special access to government funds for all pending and potential applications. I do not believe them entitled to such special treatment, especially for applications not certified before the original § 202 program was terminated.

Federal courts undoubtedly have the power to order disbursement of appropriated funds illegally impounded by the Executive. *Train v. City of New York*, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975). But it is a power to be exercised with scrupulous attention to congressional direction. In the circumstances of this case—after Congress has on several occasions indicated its intent that an old program be discontinued—judicial resurrection of that program at the instance of a litigant is clearly improper.

I respectfully dissent.

---

41. This court has recently recognized a situation of "manifest injustice" when it held that an organization already receiving funds under the direction of a statute was entitled to payment until the effective date of an amendment, *National Consumer Information Center v. Gallegos*, 179 U.S.App.D.C. 120, 549 F.2d 822 (1977), but that is clearly not the situation in this case.